#/AM 25

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS (PHENTERMINE **FILED** MDL DOCKET NO. 1203
FENFLURAMINE/DEXFENFLURAMINE)
PRODUCTS LIABILITY LITIGATION

MAR 3 0 1998

THIS DOCUMENT RELATES TO     MICHAEL E. KUNZ, Clerk
ALL ACTIONS
                                     By _____ Dep. Clerk

PRETRIAL ORDER NO. 26

## APPOINTMENT OF SPECIAL DISCOVERY MASTER

**AND NOW, TO WIT,** this 30th day of March, 1998, pursuant

to Fed. R. Civ. P. 53 the parties are ordered to show cause why

### GREGORY P. MILLER, ESQUIRE

should not be appointed as Special Discovery Master in MDL-1203.

MDL-1203 IN RE: DIET DRUGS PHENTERMINE/FENFLURAMINE/

DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION was commenced by

the docketing in this district of a transfer order under 28

U.S.C. §1407 on December 10, 1997 by the Judicial Panel on

Multidistrict Litigation covering 200 civil actions that were

pending in federal district courts in 40 states and the District

of Columbia. The filing of these actions was accompanied by a

similar substantial filing in state courts throughout the country

of the same sort of claim. The litigation involves allegations

of defects in and related to three different diet drugs – known

by the chemical names Fenfluramine, Dexfenfluramine, Phentermine

and which had been widely prescribed in the treatment of obesity.

These three diet drugs were presumably all dispensed in pill form

and more commonly prescribed for women then for men.   In
September 1997 certain manufacturers and distributors of these
products acting on a request from the FDA initiated a voluntary
withdrawal from the market of those products sold under the trade
names of Pondimin (Phenfluramine) and Redux (Dexfenfluramine).
The estimates on the number of persons taking these products and
the number of prescriptions that have been written vary but it
has been stated that an estimated 300,000 persons at about the
time of the voluntary withdrawal from the market place were
taking Fenfluramine and another 300,000 were taking
Dexfenfluramine.   The principle claim by the persons who are
plaintiffs in these cases is that use of the products have caused
or can cause heart valve injury, primary pulmonary hypertension
and other closely related disorders.   Since that first transfer
of 200 cases to this district there have been an additional 200
cases transferred here and it is anticipated that additional
large numbers of cases will arrive here through that process.
Since the initial transfer this court has convened two hearings
and following conference with assigned liaison counsel for
plaintiffs and defendants has issued a number of orders governing
the administration of these cases in the transferee district.
See PTO's 2, 3, 4, 5, 6, 7, 15, 16, 19, 10, 21 and 22.

In addition, PTO 22 has provided for a lengthy detailed plaintiff fact sheet to be completed by every plaintiff and filed together with executed information authorizations within 45 days of the plaintiff's discovery initiation date.  On February 5, 1998 by PTO 6 the court appointed a nine member Plaintiffs' Management Committee and also appointed several liaison counsel to represent manufacturers and others representing discrete defense interests. Substantial Rule 33 Interrogatories and Rule 34 Document Requests have recently been served on defendants and PTO 22 has directed that objections to those be filed promptly. The court has noticed a hearing for April 21, 1998 to dispose of those objections.  It is anticipated that the discovery process now will begin to proceed to a point where the taking of depositions in person, or by telephone will be soon underway.  It is anticipated that at least 20 and as many as 40, or possibly more, tracks of deposition activity will be functioning simultaneously on any one day in order to assure that the MDL pretrial coordination will proceed promptly so that all parties will benefit from the opportunity to develop their respective claim and defense positions without unnecessary delay.

It is the court's policy in regard to both discovery and non-discovery motion practice that the parties attempt to resolve their differences amicably before seeking judicial intervention which is costly and time consuming.  (See Local Fed.

3

R. Civ. P. 26.1(f)).  Discovery is expected to continue at an
increasing level and create discovery obligations in many places
simultaneously throughout the United States.  This circumstance
is obviously the consequence of having consolidated in this
district, cases that come from districts located in what may
ultimately be every state in the United States for not only
persons to be deposed and interviewed, but for the furnishing of
many documents and other items of evidence as well.

        With these thoughts in mind it is the court's view that
there are two major areas that warrant the participation as an
adjunct resource to the parties and the court, of a <u>Special
Discovery Master</u>.  The first is in respect to the administration
of a discovery schedule that will require the coordination of
many attorneys and witnesses participating in the taking of
depositions as well as responding to document requests and other
discovery at many locations.  While it is true that many of these
depositions will not be lengthy, and  though many will be taken
by telephone with the consent of the parties, the day to day
administration of such efforts, and especially a multi-track
deposition schedule will be complex even if it functions
smoothly.  The court finds that this deposition-discovery
schedule can best be administered by a Special Discovery Master
in cooperation with the court and the parties.  Secondly, it is
also likely that matters will develop from time to time

concerning the content of discovery that will require the
resolution of disputes.  Much of this can be promptly resolved at
the time and at the place of its occurrence if there is available
a capable, competent and dedicated neutral party in the person of
a Special Discovery Master.

While it is true that the parties can be expected to
do their best to resolve these differences without judicial
intervention, there will nevertheless be those instances when a
more formal presentation to the court will appear to be the only
avenue to resolve differences.  It is the court's belief that the
introduction of a Special Discovery Master, who will be in a
position to promptly and informally consider the views of the
parties and attempt to mediate them, will be an invaluable aid to
the overall administration of the case.  If he is unable to
succeed informally, he will be authorized to render a written
decision and recommendation to the court forthwith. This more
formal second step will allow the parties to secure a written
decision from the master after a fair and full review of the
parties respective positions, with either party thereafter having
the right within seven (7) days to appeal such ruling to the
court which will promptly consider the matter de novo.

The responsibility of the Special Discovery Master
subsidiary to these areas of his authority shall be to interact
and regularly communicate and confer with liaison counsel in

5

order to monitor the progress of all discovery as required or
expected by the court's orders.

In order to execute the duties of his office, the
Special Discovery Master shall be vested with the powers
described and contemplated under Fed. R. Civ. P. 53(c),(d), and
(e) including the right to:

(1)   review and analyze all papers, affidavits and
legal memoranda filed with the court bearing upon the parties'
discovery disputes;

(2)   schedule, convene, preside over and otherwise
conduct any meetings, hearings, conferences, disposition or
proceedings deemed necessary to resolve these disputes; and

(3)   prepare and file decisions and recommendations and
other necessary reports including a report every thirty (30) days
on the progress of the activities under the jurisdiction and
authority conferred by this order.

(4)   incur necessary expenses and costs at reasonable
levels to permit him to function fully in pursuance of the tasks
covered by this reference.  This power shall include the autority
to incur expenses and costs needed to engage the services of
needed personnel, and to acquire office space, supplies and
customary services associated therewith.

From time to time during the course of his stewardship,
the Special Discovery Master shall submit to the court an

6

application for counsel fees and costs associated with his service as Special Discovery Master and, in that respect, is authorized to incur only such fees and costs as may be reasonably necessary to fulfill his duties under this order, or such other orders as the court may issue from time to time hereafter.  Upon receipt of such application, and to the extent that such application is approved, the court will allocate between and among the parties the approved sums that the court finds should be borne by each party.  In this regard, the court will expect the Special Discovery Master to provide sufficient information and/or recommendations to assist the court in determining the manner in which fees and costs should be allocated.  Fulfilling this task as Special Discovery Master should, among other things, take into account the extent to which any unresolved discovery request or response has been unnecessarily caused, unreasonably delayed or resisted, or improperly responded to.

All decisions and recommendations, reports and application for fees and costs should be served on the PMC and the defendants' liaison counsel at the time they are filed with the court.

In those instances where a ruling made by the Special Discovery Master is accepted by the parties, he shall confirm the same by letter to the PMC and affected liaison counsel (but not to the court) if a party requests such a written confirmation.

7

All rulings made by the Special Discovery Master on disputes that are not accepted by any affected party shall be prepared by the Special Discovery Master as a "Decision and Recommendation" sequentially numbered beginning with the first such determination and recommendation.  It shall be served upon the PMC, the defendants' liaison counsel affected by the order, and the court.

The parties seeking to prevent the decision and recommendation from taking effect shall have seven (7) calendar days from the date it is filed with the court to appeal in the form of a motion with the court, accompanied by a copy of the decision and recommendation attached.  The motion should set forth the relief requested.  If no appeal is filed with the Clerk within the seven (7) day period the decision and recommendation will be deemed to be accepted by all parties, and the court will enter an order accordingly.

Since Mr. Miller's service as a Lieutenant in the Navy and as senior trial counsel in the Judge Advocate General's Office in 1978 he commenced an active trial practice in the United States Attorney's Office where he served from 1978 until 1984 concluding his career there as Chief of the Criminal Division.  Since that time he has been in private practice first as an associate and then as a partner in Hoyle, Morris and Kerr from 1985 until 1989.  Thereafter from 1989 to the present he has been a partner and currently a majority shareholder in Miller,

Alfano and Raspanti, PC, here in Philadelphia.  He has had a
brisk and active trial practice.  Much of his trial work has
involved him in regulatory compliance litigation representing
interests associated with the Commonwealth of Pennsylvania
Insurance Department.  This experience has brought him into that
field and not only litigation but also in speaking to that
industry at seminars and conferences in the area of compliance
designed to avoid health care fraud and abuse.  In this regard he
has been asked to speak to a number of organizations and
associations including the National Health Lawyers' Association,
1992; Health Care Providers Association of Delaware, 1995; Kent
County Delaware Medical Society, 1995; Blue Cross and Blue Shield
Association at its National Conference in Chicago, Illinois,
1995; National Health Care Fraud and Abuse Symposium in Los
Angeles, California, 1997; and others.  He has also been a
speaker at the Pennsylvania Bar Institute CLE Second Annual
Lawyers' Business Institute, topic: Corporate Compliance and
Internal Corporate Investigations, Philadelphia, PA 1996 and at
the Pennsylvania Bar Association's Annual Meeting on Corporate
Compliance in Pittsburgh, Pennsylvania, 1996.  Mr. Miller was
graduated from Mount Union College with a B.A. in 1972 and Case
Western Reserve University where he received his J.D. in 1975.

       The court believes that Gregory P. Miller, Esquire,
possesses the requisite skills, experience and knowledge and

other attributes which will be necessary to serve in the capacity as Special Discovery Master in this litigation.  In summary Mr. Miller is known to the court and to the legal community in this region as an active, successful and highly regarded trial lawyer. He has represented plaintiffs and defendants in the private sector and the government in the Justice Department and other officials of State Government in his wide practice.  It is the court's view that the parties to this litigation, counsel and the court will benefit from the high quality of professionalism that Mr. Miller has demonstrated in his 10 years of combined service in the United States Navy Judge Advocate General's Corps. and the United States Department of Justice together with his 14 years of service in private practice.

Any party having a reason to show cause why this appointment should not be made shall file the same with the court within 10 days of the date of this order.

**SO ORDERED.**

LOUIS C. BECHTLE,     J.