```
              IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

| | |
|---|---|
| IN RE: DIET DRUGS (PHENTERMINE/ FENFLURAMINE/DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION | MDL NO. 1203 |
| THIS DOCUMENT RELATES TO: SHEILA BROWN, et al. v. AMERICAN HOME PRODUCTS CORPORATION | CIVIL ACTION NO. 99-20593 |

**MEMORANDUM AND PRETRIAL ORDER NO.**

Bartle, C.J.                                           November 26, 2007

Before the court is the motion of Geraldine Gibson ("Ms. Gibson") for leave to register for certain benefits with the AHP Settlement Trust ("Trust"). Ms. Gibson failed to obtain a private echocardiogram by the January 3, 2003 deadline to preserve her rights to benefits under the Diet Drug Nationwide Class Action Settlement Agreement ("Settlement Agreement") with Wyeth.[1] She maintains, however, that her delay was due to "excusable neglect."

I.

According to Ms. Gibson's motion, she ingested the diet drugs commonly known as Fen-Phen[2] from June 1997 until mid-

---

1. Prior to March 11, 2002, Wyeth was known as American Home Products Corporation.

2. "Fen-Phen" is widely used to refer to the combination of the
(continued...)

September 1997.  In March 2000, Ms. Gibson submitted a completed Pink Form[3] to the Trust.[4]  In her Pink Form, Ms. Gibson stated that she ingested diet drugs between August 14, 1997 and September 1997 and that the duration of use was for 60 days or less.[5]  See Ms. Gibson's Pink Form, attached to Wyeth's response.

At some unspecified time, Ms. Gibson's mother died. This event led Ms. Gibson to have a nervous breakdown.  Ms. Gibson claims that, in June 2000, she was hospitalized for psychiatric care.[6]  Following her initial hospitalization, Ms.

---

2. (...continued)
diet drugs Fenfluramine and Phentermine.  Fenfluramine, marketed under the brand name Pondimin®, and the later related drug Dexfenfluramine, marketed under the brand name Redux™, were sold by Wyeth and are the subject of the Settlement Agreement.  In her motion, Ms. Gibson states that she was prescribed Redux™.

3.  The Accelerated Implementation Option, commonly referred to as the Pink Form, allowed class members to seek benefits afforded under the Settlement Agreement without regard to Final Judicial Approval.  See Settlement Agreement § V.

4.  In her Pink Form, Ms. Gibson stated that she was seeking reimbursement for the cost of a privately-obtained echocardiogram and cash or additional medical services ("cash/med benefit").  In her motion, Ms. Gibson does not specify which benefits she is seeking.

5.  Generally, Class Members who took diet drugs for 60 days or less are ineligible for the Screening Program.  See Settlement Agreement § IV.A.  The Screening Program provided Transthoracic Echocardiograms and associated interpretive physician visits to eligible Class Members.  See Settlement Agreement §§ I.50, IV.A.1.a, IV.A.2.b.  As Ms. Gibson was ineligible to participate in the Screening Program, she had until January 3, 2003 to obtain a private echocardiogram to preserve her right to seek benefits under the Settlement Agreement.

6.  According to a Clinical Summary, dated September 12, 2000,
(continued...)

Gibson was in and out of various hospitals for additional psychiatric treatment. In 2002, Ms. Gibson lost her job as a result of her mental illness. Although she collected unemployment benefits, Ms. Gibson claims that her rental expenses exceeded the benefits, and she lost her apartment and lived in her car. For most of 2003, Ms. Gibson was homeless. Eventually, Ms. Gibson applied for and received disability benefits, which enabled her to move back into her apartment. On March 25, 2004, Ms. Gibson called the Trust and was informed that the deadline to obtain a private echocardiogram was January 3, 2003.

Wyeth argues that Ms. Gibson's mental illness should not excuse her from complying with the relevant deadlines under the Settlement Agreement. According to Wyeth, Ms. Gibson received ample notice of the January 3, 2003 deadline. Wyeth has submitted a declaration from C. Patton Tidmore, the Director of Communications for the Trust. Mr. Tidmore avers that the Initial Notice Packet was sent to Ms. Gibson on January 23, 2000. Ms. Gibson confirmed receipt of the Initial Notice by affixing an address label included in the Notice to the Pink Form that she submitted. Additional notices were mailed to Ms. Gibson on February 18, 2002 and January 27, 2003. These notices were not

---

6. (...continued)
Ms. Gibson was hospitalized between August 27, 2000 and September 11, 2000 for psychiatric care. The Clinical Summary is the only medical record that Ms. Gibson submitted in support of her motion.

returned to the Trust as undeliverable. <u>See</u> Tidmore Decl. at ¶¶ 2-5 (Aug. 14, 2006).

Wyeth also contends that Ms. Gibson's mental illness did not prevent her from cashing her prescription reimbursement benefit. In his declaration, Mr. Patton avers that, on March 2, 2001, the Trust sent to Ms. Gibson a check in the amount of $120 for the prescription reimbursement benefit and that the check cleared on April 4, 2001. <u>See</u> Tidmore Decl. at ¶ 6 (Aug. 14, 2006). Wyeth argues that if Ms. Gibson was healthy enough to cash this check, then she also could have obtained an echocardiogram by January 3, 2003.

According to the Trust, Ms. Gibson first contacted it on March 25, 2004.[7] During this call, a Trust representative informed Ms. Gibson that, because she had not obtained a private echocardiogram, she was ineligible for additional settlement benefits. In June 2004, Ms. Gibson was advised specifically that the deadline for submitting a privately-obtained echocardiogram was January 3, 2003. In July 2004, Ms. Gibson received a private echocardiogram, which she submitted to the Trust. Mr. Tidmore avers that, during at least 30 of Ms. Gibson's calls with the Trust, she was advised that the July 2004 echocardiogram was untimely. <u>See</u> Tidmore Decl. at ¶ 7 (Aug. 11, 2006). On May 31, 2006, Ms. Gibson submitted a letter to the court requesting

---

7. The Trust also has submitted a declaration from Mr. Tidmore. According to Mr. Tidmore, "Ms. Gibson has called the Trust's call center approximately 140 times." <u>See</u> Tidmore Decl. at ¶ 3 (Aug. 11, 2006).

relief from the January 3, 2003 deadline.  On July 26, 2006, this letter was docketed as the motion that is presently before us.

## II.

The Settlement Agreement approved by this court in Pretrial Order ("PTO") No. 1415 provides strict deadlines for Class Members to seek benefits from the Trust.  <u>See</u> PTO No. 1415 (Aug. 28, 2000).  Class Members who did not participate in the Trust's Screening Program must have received a diagnosis of either FDA positive or mild mitral regurgitation by a privately-obtained echocardiogram between the commencement of diet drug use and January 3, 2003 to be eligible to receive certain benefits under the Settlement Agreement.  <u>See</u> Settlement Agreement §§ I.49, IV.B, IV.C.

The deadlines imposed by the Settlement Agreement may be extended if the movant can show his or her failure to meet the deadlines was due to "excusable neglect."  In <u>In re Orthopedic Bone Screw Products Liability Litigation</u>, 246 F.3d 315, 323 (3d Cir. 2001), our Court of Appeals reiterated the Supreme Court's analysis of excusable neglect as set forth in <u>Pioneer Investment Services Co. v. Brunswick Assocs. Ltd. Partnership.</u>, 507 U.S. 380 (1993).  Four factors should be evaluated when deciding whether excusable neglect exists:  (1) the danger of prejudice to the non-movant; (2) the length of the delay and its potential effect on judicial proceedings; (3) the reason for the delay, including whether it was within the reasonable control of the movant; and

(4) whether the movant acted in good faith.  <u>Pioneer</u>, 507 U.S. at 395; <u>Bone Screw</u>, 246 F.3d at 322-23.  We shall discuss each of these factors in turn.

An important consideration in our analysis is the danger of prejudice to Wyeth.[8]  Wyeth argues that if Ms. Gibson is given leave to register for benefits with the Trust such action will "open the floodgates" for similar claims.  Wyeth also contends that granting Ms. Gibson's motion will deny it the finality for which it bargained in the Settlement Agreement.  The finality provided by the Settlement Agreement to Wyeth, the Trust and other Class Members has been of paramount importance throughout the administration of the Settlement Agreement.  If Ms. Gibson's motion were the only one of its kind, her late registration may pose little danger of prejudicing the non-movants.  Ms. Gibson, however, is certainly not alone.  Moreover, Ms. Gibson failed to provide sufficient documentation to support her assertion that her impairment prevented her from obtaining an echocardiogram by January 3, 2003.  Without such documentation, Ms. Gibson's situation is neither unique nor specific to her.  "Although the admission of any particular claimant may not in itself cause a substantial drain on the Trust, allowing this claimant to escape the firm deadlines set forth in the Settlement Agreement ... will surely encourage others to seek the same relief."  PTO No. 3923, at 3 (Sept. 10, 2004).

---

8.  Although the Trust filed a response, it stated that it took no position on the merits of Ms. Gibson's motion.

Second, the length of the delay in meeting the deadline must be considered. The January 3, 2003 deadline to obtain a private echocardiogram was not an arbitrary date. This date was carefully chosen in light of evidence that the later the diagnosis the greater the likelihood that the Class Member's mitral valve regurgitation was not caused by diet drugs. See In re Diet Drugs, 2000 WL 1222042, at *46-*47 (E.D. Pa. Aug. 28, 2000). Diet drug induced mitral valve regurgitation is not latent and can be detected by an echocardiogram after the Class Member ceases use of the drugs. Id. Similarly, the deadline to register with the Trust was set to give Class Members ample time to complete the necessary forms and submit them to the Trust. In Ms. Gibson's case, she did not have an echocardiogram until more than eighteen months after the deadline to obtain a private echocardiogram had passed. This is not an insignificant amount of time. Moreover, Ms. Gibson waited until May 2006 before seeking relief from this court. This was almost two years after she had obtained her echocardiogram and was informed by the Trust that it was untimely and more than three years after the January 3, 2003 deadline. Therefore, to allow Ms. Gibson this lengthy extension would undermine the finality of the Settlement Agreement and open the door to similarly situated Class Members who are presently time-barred.

Third, we must evaluate the reasons for the delay. Ms. Gibson argues that she has valid reasons for missing the deadline because: (1) she suffered a nervous breakdown that required

-7-

psychiatric treatment; and (2) she lost her job and her apartment. Ms. Gibson argues that her impaired mental condition prevented her from obtaining an echocardiogram by the January 3, 2003 deadline. We find, however, that Ms. Gibson's proof of her mental impairment is inadequate. Although she claims to have been disabled since 2000, she has only submitted one medical record from September 2000. According to that report, Ms. Gibson was admitted to the Connecticut Mental Health Center in New Haven, Connecticut on August 27, 2000 and discharged on September 11, 2000. Upon entering the facility she was "disheveled and somnolent ... [and] not oriented to time or place." Pl.'s Reply. The report concluded that her condition was likely due to psychotropic medications given to Ms. Gibson when she was transferred from Waterbury Hospital in Connecticut to the Connecticut Mental Health Center. The medical report is evidence only that Ms. Gibson was in the hospital for one month in 2000. It does not prove that she has been continually disabled or incompetent since that time. Moreover, the medical record discusses her condition upon admission to the hospital, but is silent regarding her condition at the time of her release. There is therefore no evidence that the severity of her condition upon release was such that it precluded her from obtaining an echocardiogram. Without additional proof, we cannot excuse her from complying with the January 3, 2003 deadline.

  Moreover, Ms. Gibson had adequate notice of the January 3, 2003 deadline. Rule 23 of the Federal Rules of Civil

Procedure states:  "For any class certified under Rule 23(b)(3), the court must direct to class members the <u>best notice practicable under the circumstances</u>, including individual notice to all members who can be identified through reasonable effort."  Fed. R. Civ. P. 23(c)(2)(B).  An extensive notice plan was put in place to inform all Class Members of the Settlement Agreement.  <u>See</u> PTO No. 1415 at 79-87.  We have previously stated that the notice plan was the "best notice practicable under the circumstances" and concluded that it was "highly successful."  PTO No. 997 ¶ 15 at 8; PTO No. 1415 at 83.  We have concluded in the past, and still believe, that the notice plan well exceeded the "best notice practicable under the circumstances."  In addition, several notices were prepared that specifically instructed Class Members on the significance of the January 3, 2003 deadline.  Significantly, three such notices were mailed directly to Ms. Gibson; she confirmed the receipt of one and the other two were not returned to the Trust as undeliverable.  Thus, Ms. Gibson had adequate notice of the January 3, 2003 deadline.

       Finally, we have no reason to doubt that Ms. Gibson acted in good faith.  However, the danger of prejudice to non-movants and the length of, and reasons for, the delay weighs heavily in favor of finding that Ms. Gibson's actions do not constitute excusable neglect.  Accordingly, Ms. Gibson is not entitled to an extension of the applicable deadline and she is out of time to register with the Trust for benefits.

```
           IN THE UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF PENNSYLVANIA
```

| | | |
|---|---|---|
| IN RE: DIET DRUGS (PHENTERMINE/ FENFLURAMINE/DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION | ) ) ) ) | MDL NO. 1203 |
| THIS DOCUMENT RELATES TO: | ) ) ) | |
| SHEILA BROWN, et al. | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 99-20593 |
| AMERICAN HOME PRODUCTS CORPORATION | ) ) ) | |

**PRETRIAL ORDER NO.** _____

AND NOW, on this 26th day of November, 2007, for the reasons stated in the accompanying Memorandum, it is hereby ORDERED that the motion of Geraldine Gibson for leave to register for benefits with the AHP Settlement Trust is DENIED.

BY THE COURT:

/s/ Harvey Bartle III
C.J.