| | | |
|---|---|---|
| IN RE: DIET DRUGS (PHENTERMINE/ | : | MDL NO. 1203 |
| FENFLURAMINE/DEXFENFLURAMINE) | : | |
| PRODUCTS LIABILITY LITIGATION | : | |
| | : | |
| THIS DOCUMENT RELATES TO: | : | |
| | : | |
| SHEILA BROWN, et al. | : | |
| | : | |
| v. | : | |
| | : | |
| AMERICAN HOME PRODUCTS CORP. AND | : | |
| ALL OTHER ACTIONS | : | NO. 99-20593 |

**MEMORANDUM IN SUPPORT OF SEPARATE PRETRIAL ORDER NO. 8516**

Bartle, C.J.                                        August 19, 2010

Before the court is the joint petition of the Current

Joint Fee Applicants,[1] including the Current Plaintiffs'

Management Committee Fee Applicants,[2] for an award of attorneys'

---

1. The Current Joint Fee Applicants are: (a) Alexander &
Associates, P.C., a member of the Seventh Amendment Liaison
Committee ("SALC"); (b) Anapol, Schwartz, Weiss, Cohan, Feldman
and Smalley, P.C., Class Counsel; (c) Cummings, Cummings &
Dudenhefer, Co-Chair of the Plaintiffs' Management Committee
("PMC") and Class Counsel; (d) Hill & Parker, Class Counsel; (e)
Samuel Issacharoff, Esquire, one of the "Free States Attorneys"
associated with Class Counsel; (f) Levin, Fishbein, Sedran &
Berman, Plaintiffs' Liaison Counsel, Co-Chair of the PMC and
Class Counsel; (g) Lieff, Cabraser, Heimann & Bernstein, LLP, a
member of the PMC; (h) Alex MacDonald, Esquire, a member of the
PMC Discovery Committee; (i) Roda Nast, P.C., a member of the
PMC; and (j) Shrager, Spivey & Sachs, a member of SALC.

2. The Current Plaintiffs' Management Committee Fee Applicants
are: (a) Cummings, Cummings & Dudenhefer; (b) Levin, Fishbein,
Sedran & Berman; (c) Lieff, Cabraser, Heimann & Bernstein, LLP;
(continued...)

fees and expense reimbursements relating to common benefit work performed from April 1, 2007 through December 31, 2009 (the "Common Benefit Period").

All of the Current Joint Fee Applicants seek an aggregate award of attorneys' fees in the amount of $15 million from the Fund A Escrow Account for Class-related services performed during the Common Benefit Period, with such aggregate fee to be allocated and paid in accordance with a unanimous agreement among them.

The Current Plaintiffs' Management Committee ("PMC") Fee Applicants request an aggregate award of attorneys' fees in the amount of $6.58 million to be paid from the MDL 1203 Fee and Cost Account for MDL-related services performed during the Common Benefit Period, with such aggregate fee to be allocated and paid in accordance with a unanimous agreement among them.

The Plaintiffs' Liaison Counsel move for an order directing the Settlement Fund to reimburse the amount of $740,154.85 to the MDL 1203 Fee and Cost Account to repay the costs advanced from this account on behalf of the interests of the Class.

Finally, the Current Joint Fee Applicants petition for reimbursement of $105,179.59 in out-of-pocket expenses to be allocated for payment equally as between the Settlement Fund and the MDL 1203 Fee and Cost Account.

---

2.(...continued)
(d) Alex MacDonald, Esquire; and (e) Roda Nast, P.C.

## I.  BACKGROUND

In September, 1997, Wyeth (then known as American Home Products Corporation) withdrew from the market its diet drugs, Pondimin (fenfluramine) and Redux (dexfenfluramine), in the wake of findings that they were associated with valvular heart disease ("VHD") and primary pulmonary hypertension ("PPH").  A flood of lawsuits followed the withdrawal and, by the end of the year, the Judicial Panel on Multi-District Litigation directed the transfer of all federal diet drugs cases to this court for coordinated and/or consolidated pretrial proceedings.  In February, 1998, the court appointed members to the PMC to oversee the coordination of pretrial proceedings and to conduct discovery of widespread applicability on behalf of plaintiffs in MDL 1203 and state court litigation that was coordinated with the federal cases.  Pretrial Order ("PTO") No. 6 (Feb. 5, 1998).

Extensive liability discovery followed.[3]  In the Spring of 1999, Wyeth approached the PMC about negotiating a global resolution.  Ultimately, the PMC and counsel for plaintiffs in certified state class actions pending in Illinois, New Jersey, New York, Pennsylvania, Texas, Washington, and West Virginia

---

3.  The PMC assisted plaintiffs in MDL 1203 and state-federal coordinated proceedings by appearing before this court and the Special Discovery Master, engaging in motion practice with respect to case-wide discovery matters and other pretrial issues, and maintaining a document depository for all documents produced in MDL 1203, and retaining liability and generic causation experts.  The PMC also established a "Discovery Committee," which coordinated and completed the depositions of defense witnesses and experts.

began settlement negotiations.  In re Diet Drugs Prods. Liab.
Litig., No. 99-20593, 2002 WL 32154197, *3 (E.D. Pa. Oct. 3,
2002).  In November, 1999, the parties reached a Nationwide Class
Action Settlement Agreement ("Settlement Agreement") and, on
August 28, 2000, the court approved the Settlement Agreement and
certified a class of all persons in the United States, including
their representatives and dependents, who had ingested Pondimin,
Redux or both of the diet drugs.[4]

Pursuant to the Settlement Agreement, an aggregate
global settlement fund of $3.75 billion was created.  Originally,
two funds, known as Fund A and Fund B, were established to pay
for different types of benefits to class members.[5]  A trust,
known as the AHP Settlement Trust (the "Trust"), was created to
receive the Fund A and Fund B amounts and to administer the
payment of benefits.  Settlement Agreement § III.A.1.  Of the
$3.75 billion settlement fund, $1 billion was allocated to Fund A
to provide purchase price refunds, free echocardiogram
screenings, cash to pay for certain medical services, and medical

---

4.  Class members were afforded several opportunities to opt out
of the Settlement Agreement and pursue their claims in the tort
system.  Additionally, the Settlement Agreement does not resolve
the claims of those suffering from PPH.  Their claims are also
litigated separately in the tort system.

5.  In December, 2002, a Fifth Amendment to the Settlement
Agreement was approved.  Pursuant to this Amendment, Funds A and
B were merged into one fund, known as the "Settlement Fund," from
which all benefit payments were to be made.  See PTO No. 2677
(Dec. 10, 2002), aff'd In re: Diet Drugs Prods. Liab. Litig., No.
02-4581, 2004 WL 326971 (3d Cir. Feb. 23, 2004); Settlement
Agreement § III.B.4.

-4-

research related to cardiovascular disease. Additionally, $200 million was placed in an escrow account, known as the "Fund A Escrow Account," for the purpose of paying attorneys' fees to Class Counsel and Common Benefit Attorneys,[6] as well as making incentive awards to the Class Representatives. Settlement Agreement § III.B.3, VIII.E.1.a. Amounts not awarded as attorneys' fees from the Fund A Escrow Account will be refunded to Wyeth. Settlement Agreement § III.B.3. As of March 31, 2010, the Fund A Escrow Account had a total balance on deposit in the amount of $20,555,052.[7]

Fund B was established to provide compensatory damages to class members who were diagnosed with serious VHD. These benefits are awarded according to four damage "Matrices" set forth in the Settlement Agreement and are known as "Matrix Compensation Benefits." An interest-bearing escrow account, known as the "Fund B Attorneys' Fees Account," was created to pay attorneys' fees to Class Counsel and Common Benefit Attorneys involved in creating the Matrix benefits available to class members. Settlement Agreement § VIII.E.1.b. With respect to this fund, Wyeth agreed that "attorneys' fees should be awarded

_____

6. Common Benefit Attorneys are defined in the Settlement Agreement as those attorneys who actually contributed to the creation of the settlement funds through work devoted to the "common benefit" of class members, including any attorney who actually conferred benefits upon the class through state court litigation. Settlement Agreement § I.14.

7. This amount includes $972,831.04 reserved for the payment of attorneys' fees previously awarded by the court pending the resolution of litigation related to such fees.

-5-

and paid as a percentage of or otherwise based on the net present value, as of the Final Judicial Approval Date, of the maximum amounts which AHP may be legally obligated to pay to Fund B for the benefit of the Settlement Class, regardless of the amount of claims actually paid at any given point in time." Id. Wyeth then stipulated that the maximum amount that it may be required to pay to Fund B is $2.55 billion and that the attorneys' fees paid out of the Fund B Attorneys' Fees Account shall not exceed 9% of the $2.55 billion or $229 million. Id. Thus, a principal amount of $229 million was originally transferred from Fund B into the Fund B Attorneys' Fees Account.[8] As of March 31, 2010, the Fund B Attorneys' Fees Account had a total balance on deposit in the amount of $2,482,258.

There also exists an "MDL 1203 Fee and Cost Account," which holds funds used to reimburse costs and pay attorneys' fees to the PMC and other attorneys who have been authorized by the PMC to perform work for the benefit of plaintiffs in MDL 1203 and coordinated state-court proceedings. In re Diet Drugs Prods. Liab. Litig., MDL No. 1203, 1999 WL 124414, *2 (E.D. Pa. Feb. 10,

---

8. Thereafter, the Trust was required to deduct 9% from the Matrix benefits paid to each eligible class member. Where a class member was represented by counsel, the 9% assessment was deducted from the individual attorney's contingency fee. The 9% assessment also was subject to reduction if we did not award the full amount on deposit in the Fund B Attorneys' Fees Account. Settlement Agreement § VIII.E.1.c. Ultimately, we awarded 6.39% of the Fund B value and ordered the pro rata refund of the balance in the Fund B Attorneys' Fees Account to class members who had received Matrix benefits or, if represented, their attorneys. PTO No. 7763A (Apr. 9, 2008).

-6-

1999). Additionally, under PTO No. 467, a fee in the amount of 9% of any payment to a plaintiff whose action was transferred to MDL 1203 was to be set aside and placed in the MDL 1203 Fee and Cost Account. Id. If represented, these 9% assessments were deducted from the attorneys' fees payable to an individual plaintiff's counsel. Id. at *4. Additionally, we provided for the sequestration of 6% of the value of payments to plaintiffs in state court cases where the litigation was coordinated with MDL 1203 or the plaintiffs' firms entered into coordination agreements with the PMC. Id.

In October, 2002, in PTO No. 2622, the court modified PTO No. 467 and reduced the percentages to be deducted from payments to plaintiffs from 9% to 6% in federal actions and from 6% to 4% in coordinated state actions. In re Diet Drugs Prods. Liab. Litig., No. 99-20593, 2002 WL 32154197 (E.D. Pa. Oct. 3, 2002). These percentages were modified again in July, 2008. PTO No. 7896 modified PTO No. 2622 so that as of July 21, 2008 the assessment paid into the MDL 1203 Fee and Cost Account was reduced to 2.4% for federal Downstream Opt-Out cases and 1.6% for coordinated state Downstream Opt-Out cases. As of March 31, 2010, the MDL Fee and Cost Account had a total balance on deposit in the amount of $15,328,846.

In March, 2005, the Settlement Agreement was amended in response to concerns that Wyeth's funding obligations would be exhausted prior to payment of all valid claims for Matrix Compensation Benefits and to deal with the procedural

-7-

difficulties of administering a 100% audit of more than 40,000 claims for Matrix Compensation Benefits. See PTO No. 4567 (March 15, 2005). The Seventh Amendment was an ambitious and innovative change to the Settlement Agreement designed to ensure that deserving Class Members were appropriately compensated. Pursuant to the Seventh Amendment, a Supplemental Class Settlement Fund was created to receive an additional $1.275 billion from Wyeth. These funds were held and administered by a Fund Administrator that is separate from the Trust. We previously described the Seventh Amendment as follows:

> Generally, the Seventh Amendment provides for the payment of: (1) reduced Matrix Compensation Benefits to eligible class members who have submitted Matrix level I and II claims; and (2) $2,000 payments to class members who are found ineligible for Matrix Compensation Benefits, who withdraw their claims, or who are diagnosed as having only FDA Positive or mild mitral regurgitation. Class members who are eligible for Matrix Compensation Benefits will be paid based on a Relative Payment Grid, which assigns values based on medical condition, age at first diagnosis, duration of diet drug use, and the presence of alternative causation factors. [citation omitted]. In addition, these class members and those who have FDA Positive or mild mitral regurgitation are guaranteed additional payments if they develop higher level diseases. [citation omitted]. Wyeth will also offer those who participate in the Seventh Amendment a "surgery guarantee." [citation omitted]. This will extend to claimants the prospect of future compensation should their VHD progress to the point where surgery is required.

PTO No. 4567.

-8-

The Seventh Amendment to the Settlement Agreement did not establish a separate fund from which common benefit fees would be paid. Instead, this court was allowed to award a "Common Benefit Percentage" as "common benefit fees to attorneys for professional services that are found by [this] [c]ourt to be of 'common benefit' to Category One Class Members ...." Seventh Amendment § I.B.21. The Seventh Amendment defines the "Common Benefit Percentage" as "the percentage, if any, determined by the court ... of the Individual Payment Amounts payable to Category One Class Members who are entitled to receive Benefits Subject to Medical Review ...." The "Common Benefit Percentage Amount" was to be calculated by multiplying the gross Individual Payment Amounts due to each class member by the "Common Benefit Percentage." If a class member was represented by individual counsel, the "Common Benefit Percentage Amount" was to be deducted from the individual counsel's fee. Id. at § XV.T.1. Otherwise, the "Common Benefit Percentage" was to be deducted from the "Individual Payment Amount."

The PMC and Common Benefit Attorneys are required to file periodically reports setting forth the amount of time they spent on common benefit activities, as well as the hourly value of that time. Alan B. Winikur, C.P.A. was appointed by the court to audit these time and expense reports. Pursuant to PTO No. 7763A, on or before March 15 of every year, Mr. Winikur must file a report on the time and expenses submitted for examination. Each "Audit Report" concerns the professional time spent and

-9-

expenses incurred during the immediately preceding calendar year. No more than once per calendar year and within thirty days of the filing of the Audit Report, Class Counsel, Plaintiffs' Liaison Counsel and any Eligible Fee Applicant who expended professional time or incurred expenses pursuant to the written request and direction of Class Counsel or Plaintiffs' Liaison Counsel, which are included in each such Audit Report, may file a petition for an award of attorneys' fees. These fees will be paid from the Reserve Funds for the period covered by the Audit Report. They may also seek reimbursement of expenses from the Settlement Fund and/or the MDL 1203 Fee and Cost Account.

## A. THE INTERIM FEE AWARD

On October 3, 2002, the court approved an interim fee award. In re Diet Drugs Prods. Liab. Litig., No. 99-20593, 2002 WL 32154197 (E.D. Pa. Oct. 3, 2002) ("Diet Drugs I"). The court awarded counsel fees in the amount of $40 million from the Fund A Escrow Account and $40 million from the Fund B Attorneys' Fee Escrow Account. Id. at *12. Furthermore, an interim award of counsel fees in the amount of $80 million from the MDL 1203 Fee and Cost Account was approved. Id. at *20. We also established a Fee and Cost Allocation Committee ("FCAC") to develop a plan for allocation of this interim award of fees and costs. Id. at 23. In PTO No. 2859, we reduced the interim award by $6,277,088.75, which represented compensation for work performed after the deadline to submit time for the Auditor's Report, but otherwise approved the FCAC's proposed allocation. In re Diet

-10-

Drugs Prods. Liab. Litig., No. 99-20593, 2003 WL 22218322 (E.D. Pa. May 15, 2003); In re Diet Drugs Prods. Liab. Litig., 553 F. Supp. 2d 442, n.26 (E.D. Pa. 2008) ("Diet Drugs II").

## B. FINAL FEE AWARD

In April, 2008, we approved a final award of counsel fees and expense reimbursements to the PMC, Class Counsel for claimants under the Settlement Agreement, five firms that were appointed to serve on the Seventh Amendment Liaison Committee, and thirteen additional firms that we determined were allowed to participate in the award of fees. Diet Drugs II, 553 F. Supp. 2d at 442, aff'd In re Diet Drugs Prods. Liab. Litig., 582 F.3d 524 (3d Cir. 2009) ("Diet Drugs III"). This award reimbursed time expended and costs incurred through March 31, 2007.

According to Mr. Winikur's March, 2007 Auditor's Report, the Joint Fee Applicants incurred $24,233,865.23 in litigation expenses, including amounts previously approved, for the common benefit of class members and plaintiffs in MDL 1203. Id. at 463. We ordered that these amounts be paid, reimbursed, or allocated. Id. at 498.

With respect to attorneys' fees, we awarded the following additional amounts: (1) $161,569,272 from the Fund A Escrow Account; (2) $124,633,410.60 from the Fund B Attorneys' Fees Account; (3) 6.4% of the Individual Payment Amounts payable to Category One class members under the Seventh Amendment, from the Supplemental Class Settlement Fund, a sum estimated to be $71,447,638.10; and (4) $56,300,000 from the MDL 1203 Fee and

-11-

Cost Account. We applied the percentage-of-recovery method to determine the appropriate amount of counsel fees, but we cross-checked our final figures using the lodestar analysis to make sure that counsel would not receive a "windfall." Id. at 466.

The percentage-of-recovery method awards as counsel fees a percentage of the settlement value. Id. We valued the Settlement Agreement at $6,437,211,516. Id. at 472. To determine the reasonable percentage of that amount to award, we considered the Gunter/Prudential Factors and concluded that 6.75% was fair and appropriate. Id. at 485. With these figures, our award of attorneys' fees totaled $434,511,777.33. Id. The lodestar cross-check revealed that the lodestar multiplier was 2.6, which is less than the average in other super-mega-fund cases. Id. at 487. We concluded the attorneys' fees award was appropriate and that the Joint Fee Applicants were not receiving a windfall for their services. Id. at 487.

Joint Petitioners requested and we approved the creation of a Reserve Fund to compensate class-related work performed after March 31, 2007. Id. at 488-89. The amounts remaining in the Fund A Escrow Account, the Fund B Attorneys' Fees Account and the MDL 1203 Fee and Cost Account after distribution of the expense reimbursements, incentive awards, attorneys' fees and certain refunds were designated "Reserve Funds" to be used to award fees for compensable services performed after March 31, 2007 and to provide MDL 1203 reimbursements. Id. at 500.

On October 8, 2009, our Court of Appeals affirmed our award of attorneys' fees in PTO No. 7763A. Diet Drugs III, 582 F.3d 524 at 529. It held that our application of the percentage-of-recovery method to calculate the fee award was appropriate and that we properly analyzed the Gunter/Prudential Factors. Id. at 540-45.

## II. CURRENT JOINT PETITION FOR AWARD OF ATTORNEYS' FEES AND EXPENSE REIMBURSEMENTS

On March 16, 2009, Mr. Winikur filed his Fourth Audit Report setting forth the results of his audit of the professional time and expenses reported by counsel as eligible for payment or reimbursement for the period from April 1, 2007 through December 31, 2008. On March 15, 2010, the Fifth Audit Report was filed reporting professional time and expenses incurred for the period from January 1, 2009 through December 31, 2009.

In his Fourth Audit Report, he noted that the following seven attorneys and/or law firms had submitted "common benefit" time and expenses for examination: (1) Alexander & Associates, P.C.; (2) Cummings, Cummings & Dudenhefer; (3) Levin, Fishbein, Sedran & Berman; (4) Lieff, Cabraser, Heimann & Bernstein, LLP; (5) Alex MacDonald; (6) Roda Nast, P.C.; and (7) Shrager, Spivey & Sachs.

Mr. Winikur reported in his Fifth Audit Report concerning the period from January 1, 2009 through December 31, 2009 that the following seven attorneys and/or law firms had submitted "common benefit" time and expenses for his review: (1)

-13-

Anapol, Schwartz, Weiss, Cohan, Feldman & Smalley, P.C.

("Anapol"); (2) Cummings, Cummings & Dudenhefer; (3) Hill, Parker

& Roberson, LLP ("Hill"); (4) Samuel Issacharoff ("Issacharoff");

(5) Levin, Fishbein, Sedran & Berman; (6) Roda Nast, P.C.; and

(7) Shrager, Spivey & Sachs. Anapol, Hill, and Issacharoff also

provided time and expense records for the period covered by the

Fourth Audit Report, namely, April 1, 2007 through December 31,

2008. The time and expenses for these firms were not previously

reviewed and were not included in the Fourth Audit Report.

Therefore, Mr. Winikur included his analysis of all additional

time and expenses submitted by these firms in his Fifth Audit

Report.

> Mr. Winikur describes his audit protocol as follows:
>
> a. Initially, we reviewed each submission to
> determine if it complied with the form
> requirements of PTO 16. Among other things,
> this examination focused on whether the Fee
> Applicant reported time, hourly billing rates
> and "lodestar" calculations on a quarterly
> basis for each attorney or professional
> affiliated with the Applicant, whether
> appropriate time records were included with
> the submission, whether the position (e.g.,
> partner, associate, paraprofessional, or
> investigator) of each timekeeper was
> disclosed, whether the reported time was
> properly categorized in accordance with the
> requirements of PTO 16, and whether the Fee
> Applicant attached records documenting its
> claimed expenses. If we discovered
> deficiencies in compliance with the
> procedural requirements of PTO 16, they were
> brought to the attention of the Fee
> Applicant.
>
> b. Second, we examined the submissions
> substantively to determine if there were
> circumstances present which would require us

-14-

> to disallow items of time and expense or to
> refer the question of disallowance to Special
> Master Gregory Miller under paragraph 6 of
> Pretrial Order No. 5400. If we determined
> that there were such items, we transmitted a
> letter to the Fee Applicant conditionally
> disallowing the items. In these letters, we
> clearly advised the Applicant of each type of
> item contained in the Fee Submission which
> was subject to disallowance. Typically, we
> provided illustrations of each such item from
> the applicant's time and expense records.
> The letters provided an opportunity for the
> Fee Applicant to correct the deficiencies in
> its fee submission insofar as it was able to
> truthfully do so. There were no
> circumstances during this time period that
> required us to refer any submission to the
> Special Master.
>
> c.  After the substantive review phase of the
> audit process, we checked the arithmetic
> accuracy of the summaries of time and expense
> submitted by each Fee Applicant based on the
> underlying detail records that were supplied
> to us.

Fifth Audit Report ¶ 16.

Mr. Winikur reports that the lodestar value for the services performed by these attorneys for the benefit of the class and the litigants in MDL 1203 using current rates for the Fee Applicants for the periods of time covered by the Fourth and Fifth Audit Reports, beginning April 1, 2007 and ending December 31, 2009, totals $13,893,812.25. The total expenses incurred by these attorneys during the same time period are $105,179.59. According to Winikur, the court authorized payment of common benefit expenses from the MDL Fee and Cost Account in the total amount of $1,480,309.69 for the same period ending on

-15-

December 31, 2009. These were bona fide expenses paid from that account.

The Fee Applicants, as noted previously, move for an order awarding fees, expense reimbursements, and other relief as follows:

> • All of the Current Joint Fee Applicants seek an aggregate award of attorneys' fees in the amount of $15 million from the Fund A Escrow Account for class-related services performed during the Common Benefit Period, with such aggregate fee to be allocated and paid in accordance with a unanimous agreement among them;
>
> • The Current PMC Fee Applicants request an aggregate award of attorneys' fees in the amount of $6.58 million to be paid from the MDL Fee and Cost Account for MDL-related services performed during the Common Benefit Period, with such aggregate fee to be allocated and paid in accordance with a unanimous agreement among them;
>
> • Plaintiffs' Liaison Counsel move for an order directing the Settlement Fund to reimburse the amount of $740,154.85 to the MDL 1203 Fee and Cost Account to repay the costs advanced by the MDL 1203 Fee and Cost Account on behalf of the interests of the Class; and
>
> • The Current Joint Fee Applicants petition for reimbursement of $105,179.59 in out-of-pocket expenses to be allocated for payment equally as between the Settlement Fund and the MDL 1203 Fee and Cost Account.

The services were rendered and costs incurred for the following purposes: (1) securing the payment of Category One Claims under the terms of the Seventh Amendment; (2) securing the payment of Matrix claims; (3) litigating PPH issues; (4) litigating common benefit fee issues as directed by the court;

-16-

(5) managing the Cardiovascular Medical Research and Education Fund, Inc. to secure high quality research regarding PPH, its causes, treatment and cure; and (6) negotiating the Tenth Amendment, which was approved in July, 2010.

The Current Joint Fee Applicants billed 34,143.65 hours of professional time during the Common Benefit Period. The lodestar value of this time is $13,893,812.25. Class Settlement benefits in the amount of $1,117,789,973 were awarded to 14,045 Class Members and $252 million in additional recoveries for MDL and coordinated state court plaintiffs outside of the terms of the Settlement Agreement were achieved during this period.

### III.

No objections to this joint petition have been lodged. Nonetheless, we must still engage in a "thorough judicial review" as "required in all class action settlements." In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig., 55 F.3d 768, 819 (3d Cir. 1995). According to our Court of Appeals, a district court reviewing a fee petition "must exercise its inherent authority to assure that the amount and mode of payment of attorneys' fees are fair and proper." In re Cendant Corp. PRIDES Litig., 243 F.3d 722, 730 (3d Cir. 2001) (quoting Aucker v. Occidental Petroleum Corp., 192 F.3d 1323, 1328-29 (9th Cir. 1999). We must "engage in robust assessments of the fee award reasonableness factors." In re AT&T, 455 F.3d at 166 (quoting Rite Aid, 396 F.3d at 302).

When considering the 2007 joint petition for a final award of counsel fees, we applied the percentage-of-recovery method to determine the reasonableness of the requested fee. This method awards as counsel fees a percentage of the settlement value. Diet Drugs II, 553 F. Supp. 2d at 466. Our Court of Appeals stated it was "entirely appropriate" in this case. Diet Drugs III, 582 F.3d at 540. Accordingly, we will apply the percentage-of-recovery method to this petition as well and will cross-check the reasonableness of our results using an abbreviated version of the lodestar analysis.

The percentage-of-recovery method requires that we make a reasonable estimate or valuation of the settlement. GM Trucks, 55 F.3d at 822; In re Prudential, 148 F.3d at 334. We previously valued the settlement at $6,437,211,516 for purposes of the 2007 joint petition for an award of counsel fees. Diet Drugs II, 553 F. Supp. 2d at 472. There is no reason to revisit that number. It was not previously contested, it was not questioned by our Court of Appeals, and it is uncontested here. Diet Drugs III, 582 F.3d at 545. Moreover, there has not been any material change of which we are aware.[9]

_____

9. We recognize that the size of the Fund has slightly increased since our approval of the Tenth Amendment to the Settlement Agreement, pursuant to which an additional $12.5 million in funding was provided for the Cardiovascular Medical Research and Education Fund. Additionally, under the Tenth Amendment, there will be no Fund B Accretions occurring after December 31, 2011. Although these changes affect the value of the Settlement Fund, such effect is minimal compared to the overall value of the Fund. Lastly, PTO No. 7860 directed that monies remaining in the Fund B
(continued...)

Next, we consider the following ten Gunter/Prudential

Factors to determine what constitutes a reasonable percentage fee

award:

> (1) the size of the fund created and the
> number of beneficiaries, (2) the presence or
> absence of substantial objections by members
> of the class to the settlement terms and/or
> fees requested by counsel, (3) the skill and
> efficiency of the attorneys involved, (4) the
> complexity and duration of the litigation,
> (5) the risk of nonpayment, (6) the amount of
> time devoted to the case by plaintiffs'
> counsel, (7) the awards in similar cases, (8)
> the value of benefits attributable to the
> efforts of class counsel relative to the
> efforts of other groups, such as government
> agencies conducting investigations, (9) the
> percentage fee that would have been
> negotiated had the case been subject to a
> private contingent fee arrangement at the
> time counsel was retained, and (10) any
> innovative terms of settlement.

Gunter, 223 F.3d at 195; Prudential 148 F.3d at 228-40.

We must consider these factors, as well as any other

factors that are "useful and relevant with respect to the

particular facts of the case." In re AT&T Corp., 455 F.3d at

166. As each case is different, we do not apply these factors in

a "formulaic way" and are cognizant that one factor may outweigh

others. Id. Our Court of Appeals emphasized that "what is

important is that the district court evaluate what class counsel

---

9. (...continued)
Attorneys' Fee Account after distributions of attorneys' fees
pursuant to PTO Nos. 2622, 2859 and 7763A be retained for payment
of claims, as opposed to being returned to Wyeth. There is
nothing in the record to suggest this has a material effect on
the value of the Settlement Fund although it slightly increases
its size.

actually did and how it benefitted the class." In re AT&T Corp.,
455 F.3d at 165-66.

## A. SIZE OF THE FUND CREATED AND THE NUMBER OF PERSONS BENEFITTED

In our prior opinion, we determined that the size of
the Fund created is approximately $6.44 billion and that the
number of people to have benefitted is "enormous." Diet Drugs
II, 553 F. Supp. 2d at 472. During the period from April 1, 2007
through December 31, 2009, the following occurred:

> • 9,627 Class Members received payment of
> $874,707,568 in Category One benefits
> pursuant to the terms of the Seventh
> Amendment;
>
> • The Supplemental Class Settlement Fund
> paid $6,593,542 to administer the provisions
> of the Seventh Amendment for the benefit of
> Category One class members;
>
> • 525 class members received Matrix payments
> in the total gross amount of $165,864,399;
>
> • 2,921 class members received a total of
> $15,273,000 in cash/medical services
> benefits;
>
> • 397 class members received a total of
> $55,287 in purchase price refund benefits;
>
> • 575 class members received a total of
> $1,150,000 in Category Two benefit payments;
>
> • The Cardiovascular Medical Research and
> Education Fund received an additional $12.5
> million to continue its efforts to foster
> medical research and education leading to
> improved treatments of PPH; and
>
> • The Settlement Fund has paid a total of
> $41,646,177 to administer the terms of the
> Settlement Agreement so as to provide Matrix,
> cash/medical services, purchase price refunds
> and Category Two benefits to Class Members.

In the aggregate, 14,045 Class Members received
benefits totaling $1,117,789,973 pursuant to the terms of the
Settlement Agreement during the relevant period. With the
additional persons now compensated and the additional payments
now made, we can only reiterate that the immense size of the Fund
created and the thousands of people to have benefitted weighs
heavily in favor of awarding the Current Joint Fee Applicants
their requested awards.

## B.   PRESENCE OR ABSENCE OF SUBSTANTIAL OBJECTIONS

We must consider the "presence or absence of
substantial objections by members of the class to the settlement
terms and/or fees requested by counsel." Gunter, 223 F.3d at
fn.1.   In connection with the 2007 petition for fee and cost
awards, less than thirty objections were filed, all of which were
either overruled by this court with no further appeal or appealed
and dismissed. Diet Drugs II, 553 F. Supp. 2d at 473.
Similarly, all of the objections to the various amendments to the
Settlement Agreement were overruled and, where appealed, the
appeals were dismissed with prejudice. Id. Furthermore, as
noted, no objections have been filed in response to the current
fee petition. However, as we stated previously, the "paucity of
objections filed in response to the original and renewed
petitions for attorneys' fees and costs does not necessarily
establish that the requests in the Joint Petition are proper."
Id. at 474. Although we recognized that potential objectors may
not have voiced their concerns given our obligation to assure

-21-

that the amount and mode of payment of attorneys' fees is fair, we also determined that the dearth of objections was "remarkable" and indicative of the fairness of the petition. Id. We conclude similarly with respect to this petition. The absence of even one objection to the current fee petition weighs in favor of granting it but does not negate our independent obligation to ensure its reasonableness.

## C. THE SKILL AND EFFICIENCY OF THE ATTORNEYS INVOLVED

In considering this factor, the Current Joint Fee Applicants place particular emphasis on their handling of claims on behalf of class members in the face of the changes to the Settlement Agreement following approval of the Seventh Amendment. We earlier found that they handled with superior skill and efficiency the resolution of claims in this exceedingly complex class action. Diet Drugs II, 553 F. Supp. 2d at 474. With the approval of the Seventh Amendment, Class Counsel was required to deal with complicated interpretation and implementation issues during the period after March 31, 2007 that posed unique challenges compared to those faced by Class Counsel prior to its approval. We agree with this assessment. We have said before that the Current Joint Fee Applicants have demonstrated the utmost skill throughout this long and complicated litigation. This factor favors approval of the award.

## D. COMPLEXITY AND DURATION OF THE LITIGATION

In Diet Drugs II, we wrote at length regarding this factor. 553 F. Supp. 2d at 475-78. We concluded that the

-22-

complexity of this litigation is "unparalleled" and that more than a decade has passed since its inception. Id. Now, two years later, more time has passed and the Current Joint Fee Applicants have faced new and equally complex issues. Michael Fishbein, Esq., who serves as Class Counsel in connection with the Settlement Agreement and has served as Plaintiffs' Liaison Counsel and Co-Chairman of the Plaintiffs' Management Committee, describes in his affidavit in support of the Joint Petition the work performed by Class Counsel and the PMC during the period from April 1, 2007 through December 31, 2009. We will only briefly summarize some of the work that Mr. Fishbein describes.

There was much work done to administer and implement the Seventh Amendment. According to Mr. Fishbein, as of March 31, 2007, 7,163 Category One claims remained to be processed under the Seventh Amendment. These claims presented a "number of thorny legal questions and case-specific factual issues that made them difficult for the Fund Administrator to resolve with the degree of expediency that all had hoped for at the outset of the Seventh Amendment claims administration process." Fishbein Aff. ¶ 6. Thus, Class Counsel worked to resolve these issues by:

> • assisting in the processing of the claims of 763 pro se Category One Class Members,
>
> • resolving proof-of-use questions for thousands of claims,
>
> • assisting in the implementation of the "Progression During Pendency" provisions of the Seventh Amendment,

• initiating a process designed to resolve the motions of 21 Class Members for inclusion on the Category One List,

• developing and implementing a process to resolve the Seventh Amendment claims that were supported by multiple echocardiograms,

• working closely with the Fund Administrator and members of the MRCC [Medical Review Coordinating Committee] to develop and implement procedures to vet the technical sufficiency of transesophogeal echocardiograms, catheterization reports and endocarditis medical records submitted by Category One Members in support of claims under the Seventh Amendment,

• preparing detailed Memoranda of Law in connection with six motions that resulted in a favorable decision by the court or formed the basis for negotiations that led to a satisfactory resolution,

• playing a pivotal role in developing and presenting to the court the "Authorization Applications" necessary to realize the distribution of the approximate balance of $875 million that remained in the Supplemental Class Settlement Fund as of April 1, 2007,

In addition, Class Counsel helped secure the payment of matrix benefits to deserving Class Members. These claims were fraught with more significant complexities. First, there was a shift in the mix of claims presented to the Trust. It began focusing on the payment of High Level Matrix claims during this period. These claims typically involved more severe medical conditions than the claims the Trust had dealt with in the past. Additionally, a greater percentage of these Matrix claims was based on valvular repair or replacement surgery performed on Class Members aged 64 or over. Many of these claims were subject

to Medicare "liens" under the Medicare Secondary Payer Act, 42 U.S.C. § 1395y(b), which complicated the process significantly.

This work is just a fraction of that completed by Class Counsel during the period for which they request fees. It is clear that new and complex issues continued to plague the litigation. We do not depart from our previous conclusion that the complexity of this matter cannot be overstated.

With respect to the duration factor, this fee petition seeks an award of costs and fees for services performed from April 1, 2007 through December 31, 2009. This is a thirty-three month period for which Class Counsel and the PMC have received no compensation for their efforts. It is appropriate to act now.

## E. RISK OF NON-PAYMENT

With respect to this Gunter/Prudential Factor, we have said that the "risk of non-payment must be judged as of the inception of the action and not through the rosy lens of hindsight." Diet Drugs II, 553 F. Supp. 2d at 478. On appeal, objectors claimed that we erred as a matter of law by assessing the risk of nonpayment only at the beginning of litigation, instead of throughout the action." Diet Drugs, 582 F.3d at 543. However, our Court of Appeals found a fundamental flaw in that argument in that we did "reassess the risk" and our analysis was more "comprehensive" than simply analyzing the risk at the beginning. Id. Rather, we viewed the risk faced by Class Counsel at the beginning and throughout the litigation and concluded substantial risk existed. Id. The circumstances have

now changed. Class Counsel concedes that the risk of non-payment for the period following March 31, 2007 is now small given that the court has created a compensation reserve for work performed after the fee award in 2008.

**F. AMOUNT OF TIME DEVOTED TO THE CASE BY PLAINTIFFS' COUNSEL**

According to the Fifth Audit Report, the Current Joint Fee Applicants spent a total of 34,143.65 hours of professional time on compensable common benefit activities during the period from April 1, 2007 through December 31, 2009. We accept its finding.

**G. AWARDS IN SIMILAR CASES**

The present fee petition seeks an award of 0.233% of the value of the $6.4 billion Settlement Fund. This percentage must be added to the 6.75% final fee award approved in April, 2008 for a total amount of 6.98% of the Settlement Fund. For clarity, we note that the present petition seeks 1.34% of the $1,117,798,973 in Settlement Benefits paid or provided to class members during the thirty-three month Common Benefit Period. If approved, the award will be made from interest earned on the Fund A Escrow Account. The total amount of interest earned on the Fund A Escrow Account and the Fund B Attorneys' Fees Account was not included in the value of the Settlement Fund.

We previously determined that the awards sought in cases similar to this one range from 4.8% to 15%. _Diet Drugs II_, 553 F. Supp. 2d at 480. We noted that these figures should serve as "guideposts" when determining the appropriate award. _Id._ The

award sought in the present fee petition falls within these guideposts.

## H. THE VALUE OF BENEFITS ATTRIBUTABLE TO THE EFFORTS OF CLASS COUNSEL RELATIVE TO THE EFFORTS OF OTHER GROUPS

This factor requires us to consider and account for the benefits that were created by other groups, such as government agencies, when deciding on a reasonable fee. We previously stated that "Joint Fee Applicants should therefore not receive fees based upon efforts that are not their own." Diet Drugs II, 553 F. Supp. 2d at 480. In this regard, we recognized that the Joint Fee Applicants were initially aided by the Mayo Clinic in Rochester, Minnesota, which had identified the link between the ingestion of diet drugs and VHD. Id. at 481. However, that was but the first step in a very long process to achieving restitution for class members. We conclude now, as we did before, that "we cannot underestimate the essential and significant role played by the [Current] Joint Fee Applicants in creating the value of this Settlement Agreement." Id. Neither the Government, nor its agencies, provided the type of heavy-lifting that is sometimes provided in antitrust or securities cases. Certainly, no other group has provided any aid to the Current Joint Fee Applicants in connection with the work they performed during the period at issue here. This factor weighs in favor of the fee award.

**I. THE PERCENTAGE FEE THAT WOULD HAVE BEEN NEGOTIATED HAD THE CASE BEEN SUBJECT TO A PRIVATE CONTINGENT FEE AGREEMENT AT THE TIME COUNSEL WAS RETAINED**

When we were considering the final fee award in this case, we were urged to look at the Major Filers Agreement when analyzing this factor. Diet Drugs II, 553 F. Supp. 2d at 482. Pursuant to this agreement, the Major Filers[10] agreed that the requested award was proper and agreed to support the petition of Fee Applicants seeking those fees. Id. We stated:

> The Major Filers Agreement is noteworthy. It is a barometer of the perceived value of the Joint Fee Applicants' services since the Major Filers were, in essence, the market for the Joint Fee Applicants' services. The Major Filers were not only the Joint Fee applicants' colleagues in this litigation but also beneficiaries of the Joint Fee Applicants' efforts. The ultimate "market" for the Joint Fee Applicants' services was obviously comprised of the Class members who were injured by the diet drugs and, as a result, were compensated by the Settlement Agreement. It would be impossible, however, to gauge with accuracy the value of the Joint Fee Applicants' services relying on that market definition. In this case, therefore, we believe the opinion of the Major Filers is an adequate substitute.

553 F. Supp. 2d at 482.

Here, the Current Joint Fee Applicants urge us to grant the present fee petition because it seeks an award of only a

---

10. The Major Filers: "(1) represent[ed] about 97% of the Class Members who exercised Downstream Opt-Outs and filed lawsuits subject to the MDL 1203 fee assessments; (2) filed 26,000 Level I and Level II Matrix Benefit claims that became Category One Claims under the Seventh Amendment; (3) represented about half of the Class Members who have had Matrix Benefits claims processed by the Trust." Diet Drugs II, 553 F. Supp. 2d at 482.

portion of the fees the Major Filers agreed Class Counsel should receive. Namely, the Major Filers stipulated that the attorneys' fees awarded to Class Counsel should include the interest earned in the Fund A Escrow Account and the Fund B Attorneys' Fees Account.

We agree with the Current Joint Fee Applicants that estimating the percentage fee that would have been negotiated through a private contingent fee agreement would be extremely difficult at this point. As we noted before, the Major Filers Agreement serves as the best predictor of what the market would have permitted in this regard. We find their agreement favors the award sought now.

## J. INNOVATIVE TERMS OF THE SETTLEMENT

We have previously said that "we cannot deny that the Settlement Agreement provisions [...] were indeed innovative at the time they were drafted and have already served as models for other cases." Diet Drugs II, 553 F. Supp. 2d at 485. We continue to hold this view.

## IV.

In light of our review of the Gunter/Prudential Factors, we believe that the requested fee of $15 million from the Reserve Funds on deposit in the Fund A Escrow Account, which represents 0.233% of the value of the Settlement Fund, is reasonable to compensate the Current Joint Fee Applicants for the work they performed from April 1, 2007 through December 31, 2009.

-29-

## V. THE LODESTAR CROSS-CHECK

We perform a lodestar cross-check of the fee award generated using the percentage-of-recovery method to ensure that the Current Joint Fee Applicants are not receiving a windfall. The "lodestar cross-check is performed by multiplying the hours reasonably expended on the matter by the reasonable hourly billing rate which then provides the court with the 'lodestar calculation.'" Diet Drugs II, 553 F. Supp. 2d at 485. This number is divided into the proposed fee award, namely, $15 million. The resulting number is the lodestar multiplier, which is compared to lodestar multipliers in similar cases. Id.

According to Mr. Winikur's Fifth Audit Report, the total lodestar value of the professional time of each Fee Applicant, using rates for the Fee Applicants for the periods of time covered by the Fourth Audit Report and the Fifth Audit Report, is $13,893,812.25. The requested fee of $15 million divided by this lodestar value yields a lodestar multiple of 1.08. We set forth in our opinion on the final fee award the lodestar multipliers for similar super-mega-fund cases. Id. at 486. They ranged from 2.4 to 4.45. When considered in light of the previous fee awards in this litigation, the lodestar multiplier of 1.08 for the current fee petition is reasonable.

## VI. THE AWARD OF FEES FROM THE MDL 1203 ACCOUNT

Current Joint Fee Applicants also seek an award of $6.58 million from the MDL 1203 Fee and Cost Account. Since March 31, 2007, plaintiffs obtained recoveries in MDL 1203 and

coordinated state-court cases that are subject to assessment under PTO Nos. 467[11], 517[12], 2622[13], and 7896[14] in the amount of approximately $253 million. Current Joint Fee Applicants now seek approximately $6.58 million in assessments subject to the prior fee awards by this court.

During the period at issue, the PMC has continued to manage the coordinated pretrial proceedings in MDL 1203 for the benefit of diet drug plaintiffs with federal actions or coordinated state-court actions. Specifically, the PMC continued to manage the PMC office until December 31, 2008 and, in this regard, it maintained a database on the status of each MDL 1203 action, updated the MDL "Trial Package," sent copies of this package of discovery materials to attorneys prosecuting PPH and Opt-Out cases, assisted them with procedural questions, and

---

11.    In PTO No. 467, the court created the MDL 1203 Fee and Cost Account and required the sequestration of 9% of any payment to a plaintiff whose action was transferred to MDL 1203. The court also permitted state/federal coordination between diet drug cases pending in MDL 1203 and those pending in California and other jurisdictions and required the sequestration of 6% of any payment to plaintiffs in such coordinated state court actions.

12.    PTO No. 517 extended PTO No. 467 to all MDL 1203 civil actions, irrespective of the jurisdictions from which the actions were transferred.

13.    PTO No. 2622 adjusted the assessment percentages from 9% to 6% in federal actions and from 6% to 4% in state actions. In re Diet Drugs Prods. Liab. Litig., MDL No. 1203, 2002 WL 32154197 (E.D. Pa. Oct. 3, 2002).

14.    PTO No. 7896 modified PTO No. 2622 so that as of July 21, 2008 the assessments paid into the MDL 1203 Fee and Cost Account were reduced to 2.4% for federal Downstream Opt-Out cases and 1.6% for coordinated state Downstream Opt-Out cases.

assisted the court and the Special Discovery Master in the administration of the discovery process. After the closure of the PMC Office in December, 2008, the Plaintiffs' Liaison Counsel continued to perform these functions.

When reviewing our final fee award in this case, our Court of Appeals explained the standard for awarding to court-appointed management committees a portion of the claim recoveries earned as follows:

> "Under the common benefit doctrine, an award of attorney's fees is appropriate where 'the plaintiff's successful litigation confers a substantial benefit on the members of an ascertainable class, and where the court's jurisdiction over the subject matter of the suit makes possible an award that will operate to spread the costs proportionately among them. [citation omitted]. Thus, in order to obtain common benefit fees, an attorney must confer a substantial benefit to members of an ascertainable class, and the court must ensure that the costs are proportionately spread among that class.

Diet Drugs III, 582 F.3d at 546.

Our first step is to determine whether the PMC and the authorized common benefit attorneys conferred a substantial benefit on the individuals in MDL 1203. On appeal from our award of the final fee award, appellants argued that the initial Opt-Out and PPH claimants did not receive a substantial benefit. Our Court of Appeals agreed with our reasoning that the "PMC had, to the benefit of every claimant, helped to administer the MDL by tracking individual cases, distributing court orders, and serving as a repository of information concerning the litigation and

-32-

settlement," among other things, and held that the record
"substantially supported" that conclusion. Diet Drugs III, 582
F.3d at 548.

The PMC has continued these efforts since that time and
accordingly plaintiffs have continued to receive a substantial
benefit from their work.

Our Court of Appeals also found that the costs were
spread proportionally among the plaintiffs. Id. at 550. Nothing
has happened in the interim to change this conclusion. Those
cases that settled after our award of the final fee award reaped
benefits to the same extent as those that settled prior thereto.
There is no reason to depart from our holding and that of the
Court of Appeals that the Current Joint Fee Applicants are
entitled to receive assessments that have been deposited in the
MDL 1203 Fee and Cost Account. Accordingly, we will authorize
the disbursement to the Current PMC Fee Applicants of
$6,584,524.96 in assessments that have been deposited since the
court's prior fee award.

**VII. THE AWARD AND ALLOCATION OF EXPENSE REIMBURSEMENTS**

The Current Joint Fee Applicants incurred a total of
$1,585,489.28 in documented expenses for the common benefit of
class members and the plaintiffs in MDL 1203 for the period
April 1, 2007 through December 31, 2009. We have already entered
orders authorizing reimbursement of $1,480,309.69 of these
expenses from the MDL 1203 Fee and Cost Account. The remaining
balance represents expenses that were advanced by the following

-33-

Current Joint Fee Applicants in the following amounts: (1)
$18,553.47 from Cummings, Cummings & Dudenhefer; (2) $6,330.30
from Hill & Parker; (3) $59,967.50 from Levin, Fishbein, Sedran &
Berman; (4) $11,108.42 from Lieff, Cabraser, Heimann & Bernstein,
LLP; and (5) $9,219.90 from Roda Nast, P.C.

PTO No. 7763 approved a stipulation between Wyeth and
Class Counsel that at least 50% of the expenses from the funds on
deposit in the MDL 1203 Fee and Cost Account and/or advanced by
the Current Joint Fee Applicants should be paid by the Settlement
Fund as they were expended for Class-related purposes.
Accordingly, we will enter an order directing that the Settlement
Fund reimburse the MDL 1203 Fee and Cost Account the amount of
$740,154.85, which represents 50% of the expenses paid from the
MDL 1203 Fee and Cost Account during the period from April 1,
2007 through December 31, 2009, and 50% of the out-of-pocket
costs advanced by the Current Joint Fee Applicants with the
remaining 50% to be reimbursed from the MDL 1203 Cost and Fee
Account.

### VIII.

In conclusion, we will award attorneys' fees and
expenses as set forth in the attached pretrial order.