IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: DIET DRUGS (PHENTERMINE/ FENFLURAMINE/DEXFENFLURAMINE) PRODUCTS LIABILITY LITIGATION | ) ) ) | MDL NO. 1203 |
| ———————————————— | ) | |
| THIS DOCUMENT RELATES TO: | ) ) | |
| SHEILA BROWN, et al. | ) ) | |
| v. | ) ) | CIVIL ACTION NO. 99-20593 |
| AMERICAN HOME PRODUCTS CORPORATION | ) ) ) | 2:16 MD 1203 |

<u>**MEMORANDUM IN SUPPORT OF SEPARATE PRETRIAL ORDER NO.**</u> **8983**

Bartle, J.                                                      December 11, 2012

The Estate of Ginger S. Grogg, a.k.a. Marguerite G. Grogg ("Estate"), a representative claimant under the Diet Drug Nationwide Class Action Settlement Agreement ("Settlement Agreement") with Wyeth,[1] seeks benefits from the AHP Settlement Trust ("Trust").[2]  Based on the record developed in the show cause process, we must determine whether the Estate has demonstrated a reasonable medical basis to support its claim for Matrix Compensation Benefits ("Matrix Benefits").[3]

---

1.  Prior to March 11, 2002, Wyeth was known as American Home Products Corporation.

2.  Gregg S. Grogg, Gensa L. Baker, and Gaye Amaro, Ginger S. Grogg's ("Ms. Grogg" or "decedent") children, have also submitted derivative claims for benefits.  The Trust, however, determined that the derivative claimants are not eligible to receive benefits.

3.  Matrix Benefits are paid according to two benefit matrices
(continued...)

To seek Matrix Benefits, a representative claimant[4] must first submit a completed Green Form to the Trust.  The Green Form consists of three parts.  The representative claimant completes Part I of the Green Form.  Part II is completed by an attesting physician who must answer a series of questions concerning the decedent's medical conditions that correlate to the Matrix criteria set forth in the Settlement Agreement.  Finally, if the representative claimant is represented by an attorney, the attorney must complete Part III.

In November, 2003, Gregg S. Grogg, the legal representative of the Estate of Ginger S. Grogg, submitted an amended Green Form to the Trust signed by the attesting

_____

3.   (...continued)
(Matrix "A" and Matrix "B"), which generally classify for compensation purposes Diet Drug Recipients based upon the severity of their medical conditions, their ages when they are diagnosed, and the presence of other medical conditions that also may have caused or contributed to the Diet Drug Recipient's valvular heart disease ("VHD").  See Settlement Agreement §§ IV.B.2.b. & IV.B.2.d.(1)-(2).  Matrix A-1 describes the compensation available to representative claimants where the Diet Drug Recipients are diagnosed with serious VHD, they took the drugs for 61 days or longer, and they did not have any of the alternative causes of VHD that made the B matrices applicable. In contrast, Matrix B-1 outlines the compensation available to representative claimants where the Diet Drug Recipients were registered as having only mild mitral regurgitation by the close of the Screening Period, they took the drugs for 60 days or less, or they were diagnosed with conditions that would make it difficult for them to prove that their VHD was caused solely by the use of these Diet Drugs.

4.   Under the Settlement Agreement, representative claimants include estates, administrators, or other legal representatives, heirs or beneficiaries.  See Settlement Agreement § II.B.

physician, Michael J. Liston, M.D.[5]  Based on an echocardiogram
dated November 24, 1999, Dr. Liston attested in Part II of the
Green Form that Ms. Grogg suffered from moderate mitral
regurgitation[6] and New York Heart Association Functional Class
III symptoms.  Dr. Liston further attested that Ms. Grogg had
surgery to repair or replace the aortic and/or mitral valve(s)
following the use of Pondimin® and/or Redux™ and an ejection
fraction of < 40% at any time six months or later after valvular
repair or replacement surgery.  Based on such findings, the
Estate would be entitled to Matrix A-1, Level V benefits in the
amount of $479,876.[7]

> Dr. Liston also attested in the Green Form that the
Ms. Grogg did not suffer from mitral annular calcification.

---

5.  The Estate also submitted a Green Form in December, 2004
signed by Jeffrey S. Fierstein, M.D.  The Trust contends this
Green Form is not operative because it was submitted after the
claim was complete and transferred to the Class Counsel Claims
Office pursuant to Pretrial Order ("PTO") No. 3882 (Aug. 26,
2004).  The Estate disagrees.  We, however, need not resolve this
dispute because the issue presented for our resolution is the
same under both Green Forms.

6.  Dr. Liston also attested that Ms. Grogg suffered from an
abnormal left atrial dimension and a reduced ejection fraction in
the range of 30% to 34%.  These conditions are not at issue in
this claim.

7.  Under the Settlement Agreement, a claimant or representative
claimant is entitled to Level V Matrix Benefits if the Diet Drug
Recipient qualifies for payment at Matrix Levels III or IV, had
New York Heart Association Functional Class III or Class IV
symptoms, underwent surgery to repair or replace the aortic
and/or mitral valve(s), and had a left ventricular ejection
fraction < 40% six months after valvular repair or replacement
surgery.  See Settlement Agreement § IV.B.2.c.(5)(b)ii).

Under the Settlement Agreement, the presence of mitral annular
calcification requires the payment of reduced Matrix Benefits.
See Settlement Agreement § IV.B.2.d.(2)(c)ii)d).  As the Trust
does not contest the Estate's entitlement to Level V benefits,
the only issue before us is whether the Estate is entitled to
payment on Matrix A-1 or Matrix B-1.

In March, 2005, the Trust forwarded the claim for
review by Donna R. Zwas, M.D., F.A.C.C., one of its auditing
cardiologists.[8]  In audit, Dr. Zwas concluded that there was no
reasonable medical basis for Dr. Liston's finding that Ms. Grogg
did not have mitral annular calcification.  Specifically,
Dr. Zwas explained that "[p]osterior, lateral, and medial [mitral
annular calcification] is seen."

Based on the auditing cardiologist's finding that
Ms. Grogg had mitral annular calcification, the Trust issued a
post-audit determination that the Estate was entitled only to
Matrix B-1, Level V benefits.  Pursuant to the Rules for the
Audit of Matrix Compensation Claims ("Audit Rules"), the Estate
contested this adverse determination.[9]  In contest, the Estate

---

8.  Pursuant to PTO No. 3882, all Level III, Level IV, and Level
V Matrix claims are subject to the Parallel Processing Procedures
("PPP").  As Wyeth did not agree that the Estate had a Matrix A,
Level V claim, pursuant to the PPP, the Trust audited the
Estate's claim.

9.  Claims placed into audit on or before December 1, 2002 are
governed by the Policies and Procedures for Audit and Disposition
of Matrix Compensation Claims in Audit, as approved in PTO
No. 2457 (May 31, 2002).  Claims placed into audit after
December 1, 2002 are governed by the Audit Rules, as approved in
(continued...)

argued that the phrase "reasonable medical basis" means that an attesting physician's conclusions must be accepted unless the Trust proves they were "irrational, foolish, senseless, etc. from any medical perspective" and that a mere difference of opinion is insufficient to deny a claim for Matrix Benefits (emphasis in original).[10]  In addition, the Estate contended that there was a reasonable medical basis for the attesting physician's representation that Ms. Grogg did not suffer from mitral annular calcification because seven additional physicians have examined Ms. Grogg's mitral valve, either directly or by echocardiogram, and have not noted the presence of mitral annular calcification.[11]

Although not required to do so, in July, 2005, the Trust forwarded the claim to the auditing cardiologist for a second review.  Dr. Zwas submitted a declaration in which she again concluded that there was no reasonable medical basis for

---

9.  (...continued)
PTO No. 2807 (Mar. 26, 2003).  There is no dispute that the Audit Rules contained in PTO No. 2807 apply to the Estate's claim.

10.  The Estate also argues, in this and later submissions, that it should receive Matrix Benefits because the Trust did not timely complete Ms. Grogg's audit or otherwise comply with the timing requirements of the Audit Rules.  The Estate, however, failed to demonstrate how it was prejudiced by this delay.  As we previously discussed in PTO No. 6339, "we are unwilling to order payment on an uncompensable claim solely based on an 'out of time' argument without, at a minimum, some showing of prejudice." PTO No. 6339 at 13 n.10 (May 25, 2006).

11.  The Estate subsequently submitted a letter to the Trust arguing that the Trust subjected a prior Green Form to audit, rather than the Green Form of Dr. Fierstein.

the attesting physician's finding that Ms. Grogg did not have
mitral annular calcification.  In support of this conclusion,
Dr. Zwas stated:

> I again observed unquestionable evidence of
> mitral annular calcification on Ms. Grogg's
> November 24, 1999 echocardiogram.  Mitral
> annular calcification is clearly observed in
> the parasternal view at frame 00357.01
> (9:15:44 on the clock), and in the apical
> views at frame 00394.28 (09:00:45 on the
> clock).

Dr. Zwas also stated that whether the echocardiogram and cardiac
catheterization reports noted mitral annular calcification was
irrelevant to whether Ms. Grogg actually had mitral annular
calcification.  Finally, Dr. Zwas reviewed the January 18, 2000
angiogram and stated that it did not alter her conclusion.

Based on the second review, the Trust issued a final
post-audit determination, again determining that the Estate was
entitled only to Matrix B-1, Level V benefits.  The Estate
disputed this final determination, arguing that the Trust's
record was incomplete as it did not contain reports of
Ms. Grogg's December 1, 1994 and March 22, 1999 echocardiograms,
which it attached.  According to the Estate, the process was
"tainted" and it was entitled to a new audit.

In September, 2005, the Trust forwarded the claim to
Dr. Zwas for a third review.  Dr. Zwas submitted an amended
declaration in which she again concluded that Ms. Grogg had
mitral annular calcification and that there was no reasonable
medical basis for the attesting physician's representation to the

contrary.  In addition, Dr. Zwas stated that she considered the
two additional echocardiogram reports of December 1, 1994 and
March 22, 1999 and concluded that they were irrelevant to whether
Ms. Grogg's November 24, 1999 echocardiogram demonstrated mitral
annular calcification.  Dr. Zwas also explained that physicians
interpreting echocardiograms do not always comment on every
condition they observe, especially a common condition such as
mitral annular calcification.

        Thus, in October, 2005, the Trust issued an amended
final post-audit determination, again determining that the Estate
was entitled only to Matrix B-1, Level V benefits.  The Estate
disputed this amended final determination and requested that the
claim proceed to the show cause process established in the
Settlement Agreement.  See Settlement Agreement § VI.E.7.; PTO
No. 2807, Audit Rule 18(c).  The Trust then applied to the court
for issuance of an Order to show cause why the Estate's claim
should be paid.  On January 12, 2006, we issued an Order to show
cause and referred the matter to the Special Master for further
proceedings.  See PTO No. 5940 (Jan. 12, 2006).

        Once the matter was referred to the Special Master, the
Trust submitted its statement of the case and supporting
documentation.  The Estate then served a response upon the
Special Master.  The Trust submitted a reply on June 23, 2006,
and the Estate submitted a sur-reply on August 10, 2006.  Under
the Audit Rules, it is within the Special Master's discretion to

appoint a Technical Advisor[12] to review claims after the Trust
and the Estate have had the opportunity to develop the Show Cause
Record.  See Audit Rule 30.  The Special Master assigned a
Technical Advisor, Gary J. Vigilante, M.D., F.A.C.C., to review
the documents submitted by the Trust and the Estate and to
prepare a report for the court.  The Show Cause Record and
Technical Advisor Report are now before the court for final
determination.  See id. Rule 35.

        The issue presented for resolution of this claim is
whether the Estate has met its burden in proving that there is a
reasonable medical basis for the attesting physician's finding
that Ms. Grogg did not have mitral annular calcification.  See
id. Rule 24.  Ultimately, if we determine that there is no
reasonable medical basis for the answer in the Green Form that is
at issue, we must affirm the Trust's final determination and may
grant such other relief as deemed appropriate.  See id.
Rule 38(a).  If, on the other hand, we determine that there is a
reasonable medical basis for the answer, we must enter an Order
directing the Trust to pay the claim in accordance with the
Settlement Agreement.  See id. Rule 38(b).

_____

12.  A "[Technical] [A]dvisor's role is to act as a sounding
board for the judge–helping the jurist to educate himself in the
jargon and theory disclosed by the testimony and to think through
the critical technical problems." Reilly v. United States, 863
F.2d 149, 158 (1st Cir. 1988).  In a case such as this, where
there are conflicting expert opinions, a court may seek the
assistance of the Technical Advisor to reconcile such opinions.
The use of a Technical Advisor to "reconcil[e] the testimony of
at least two outstanding experts who take opposite positions" is
proper.  Id.

In support of its claim, the Estate reasserts the arguments it made in contest; namely, that none of the physicians involved in Ms. Grogg's care noted that the she had mitral annular calcification.  The Estate also objects to the fact that its claim was "audited" three times.

In response, the Trust argues that the medical records cited by the Estate do not establish a reasonable medical basis for the Green Form representation that Ms. Grogg did not have mitral annular calcification.  According to the Trust, the issue is whether Ms. Grogg's November 22, 1999 echocardiogram, not other echocardiograms, demonstrates mitral annular calcification. In addition, the Trust contends that the "failure to note the presence of mitral annular calcification in an echocardiogram report does not negate its existence."  The Trust also asserts that a surgeon would not be in a position to view mitral annular calcification and that the pathologist only was given a portion of the mitral valve and not the annulus.

The Technical Advisor, Dr. Vigilante, reviewed Ms. Grogg's echocardiogram and medical records and concluded that there was no reasonable medical basis for the attesting physician's finding that Ms. Grogg did not have mitral annular calcification.  Specifically, Dr. Vigilante found that:

> This study demonstrated obvious significant mitral annular calcification.  There was rather severe thickening of the posterolateral annulus with increased reflectance of echoes consistent with calcification.  This was a definite diagnosis on this study.  This is not even close to a

borderline call.  The calcification also
involved part of the mitral leaflets and
subvalvular apparatus including chords.  This
calcification was also seen medially along
the mitral annulus.  The mitral annular
calcification was noted in the parasternal
long-axis view, parasternal short-axis view,
apical four chamber view, apical two chamber
view, and subcostal view....  The time frames
documented by Dr. Zwas on the tape were
reviewed in detail and, indeed, demonstrated
obvious mitral annular calcification.

In response to the Technical Advisor Report, the Estate

argues that Dr. Vigilante "is obviously a pawn of the Trust

placed in a position to ensure that Claimants are summarily

denied benefits that they are rightfully entitled to ...."  The

Estate also asserts that the opinions of Dr. Zwas and

Dr. Vigilante are entitled to less weight than the opinions

provided by Ms. Grogg's physicians because Dr. Zwas and

Dr. Vigilante are not "clinical cardiologists" and many of the

opinions provided by Ms. Grogg's physicians were not related to

or dictated by litigation.

After reviewing the entire Show Cause Record, we find

the Estate's arguments are without merit.  As an initial matter,

the Estate does not adequately refute or respond to the findings

of Dr. Zwas or Dr. Vigilante.  Specifically, Dr. Zwas determined

that the November 24, 1999 echocardiogram demonstrated mitral

annular calcification "in the parasternal view at frame 00357.01

(9:15:44 on the clock), and in the apical views at frame 00394.28

(09:00:45 on the clock)."[13]  Dr. Vigilante reviewed these frames

and confirmed that they "demonstrated obvious mitral annular

calcification."[14]  Rather than challenge these specific findings,

the Estate relies on various echocardiogram and cardiac

catheterization reports, an operative report, and a pathology

report, each of which is silent on the presence of mitral annular

calcification.  Dr. Zwas, however, specifically noted that a

cardiologist interpreting an echocardiogram will not always

reference every condition observed, particularly when the

condition is a common one like mitral annular calcification.  In

addition, the Trust contended that the surgeon who completed the

surgical report noted that visibility of the mitral valve during

surgery "was very poor" and that only a portion of the mitral

valve, not the mitral annulus, was provided to the pathologist.

The Estate did not address these contentions or identify any

particular error in the conclusions of the auditing cardiologist

or the Technical Advisor.  Mere disagreement with the auditing

cardiologist and the Technical Advisor without identifying any

_____

13.  We also reject the Estate's contention that the claim should
be paid because it was subjected to audit three times by the same
auditing cardiologist.  The Trust submitted the claim for second
and third reviews based on arguments and information submitted by
the Estate subsequent to the audit that Dr. Zwas had purportedly
had not considered.  We perceive nothing improper with this
practice, and the Estate has not demonstrated how it was
prejudiced by the second and third reviews of Dr. Zwas.

14.  The Estate's arguments that Dr. Vigilante is biased or
unqualified are also without merit.  We appointed Dr. Vigilante,
after determining that he possessed the necessary skills and
expertise, to assist us in reviewing Matrix claims in the show
cause process.  See PTO No. 3212 at 9 (Jan. 14, 2004).

specific errors by them is insufficient to meet a the Estate's
burden of proof.

        We also disagree with the Estate's definition of
reasonable medical basis.  Without any discussion, the Estate
relies on <u>Gallagher v. Latrobe Brewing Co.</u>, 31 F.R.D. 36
(W.D. Pa. 1962) and <u>Black's Law Dictionary</u>, 1538 (6th ed. 1990),
for determining what constitutes a reasonable medical basis.
Such reliance, however, is misplaced.  In <u>Gallagher</u>, the court
simply addressed the circumstances under which the court would
appoint an impartial expert witness to be presented to the jury
and, therefore, the case is not apposite.  See <u>Gallagher</u>, 31
F.R.D. at 38.  The Estate also relies on the definition of
"unreasonable" in <u>Black's</u>.  One of the definitions, however, is
"not guided by reason."  The word "unreasonable" does not always
mean "irrational" as the Estate would have us believe and it does
not mean that here.  We are not persuaded that either <u>Gallagher</u>
or <u>Black's</u> supports the Estate's position.

        For the foregoing reasons, we conclude that the Estate
has not met its burden of proving that there is a reasonable
medical basis for finding that Ms. Grogg did not have mitral
annular calcification.  Therefore, we will affirm the Trust's
denial of the Estate's claim for Matrix A benefits.