IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

IN RE: DIET DRUGS (PHENTERMINE/      )
FENFLURAMINE/DEXFENFLURAMINE)        )       MDL NO. 1203
PRODUCTS LIABILITY LITIGATION        )
                                     )
_____)
                                     )
THIS DOCUMENT RELATES TO:            )
                                     )
SHEILA BROWN, et al.                 )
                                     )       CIVIL ACTION NO. 99-20593
          v.                         )
                                     )
AMERICAN HOME PRODUCTS               )       2:16 MD 1203
CORPORATION                          )

MEMORANDUM IN SUPPORT OF SEPARATE PRETRIAL ORDER NO. 9226

Bartle, J.                                            April 15, 2014

        The Estate of Dennis J. Kennedy ("Estate"), a

representative claimant under the Diet Drug Nationwide Class

Action Settlement Agreement ("Settlement Agreement") with Wyeth,[1]

seeks benefits from the AHP Settlement Trust ("Trust").[2]  Based

on the record developed in the show cause process, we must

determine whether the Estate has demonstrated a reasonable

medical basis to support its claim for Matrix Compensation

Benefits ("Matrix Benefits").[3]

---

1.   Prior to March 11, 2002, Wyeth was known as American Home
Products Corporation.  In 2009, Pfizer, Inc. acquired Wyeth.

2.   Patti Kennedy, the spouse of Dennis J. Kennedy ("Mr.
Kennedy"), also has submitted a derivative claim for benefits.

3.   Matrix Benefits are paid according to two benefit matrices
(Matrix "A" and Matrix "B"), which generally classify Diet Drug
Recipients for compensation purposes based upon the severity of
                                             (continued...)

To seek Matrix Benefits, a representative claimant[4] must first submit a completed Green Form to the Trust. The Green Form consists of three parts. The representative claimant completes Part I of the Green Form. Part II is completed by an attesting physician, who must answer a series of questions concerning the Diet Drug Recipient's medical conditions that correlate to the Matrix criteria set forth in the Settlement Agreement. Finally, if the representative claimant is represented by an attorney, the attorney must complete Part III.

In December, 2011, Patti Kennedy, the personal representative of the Estate, submitted a completed Green Form to the Trust signed by the attesting physician, Manoj R. Muttreja, M.D. Based on an echocardiogram dated February 7, 2002, Dr. Muttreja attested in Part II of the Green Form that

_____

3. (...continued)
their medical conditions, their ages when they are diagnosed, and the presence of other medical conditions that also may have caused or contributed to the Diet Drug Recipient's valvular heart disease ("VHD"). See Settlement Agreement §§ IV.B.2.b. & IV.B.2.d.(1)-(2). Matrix A-1 describes the compensation available to representative claimants where the Diet Drug Recipients were diagnosed with serious VHD, they took the drugs for 61 days or longer, and they did not have any of the alternative causes of VHD that made the B matrices applicable. In contrast, Matrix B-1 outlines the compensation available to representative claimants where the Diet Drug Recipients were registered as having only mild mitral regurgitation by the close of the Screening Period, they took the drugs for 60 days or less, or they were diagnosed with conditions that would make it difficult for them to prove that their VHD was caused solely by the use of these Diet Drugs.

4. Under the Settlement Agreement, representative claimants include estates, administrators or other legal representatives, heirs, or beneficiaries. See Settlement Agreement § II.B.

Mr. Kennedy suffered from mild aortic regurgitation and had surgery to repair or replace the aortic and/or mitral valve(s) following the use of Pondimin® and/or Redux™.  Based on such findings, the Estate would be entitled to Matrix A-1, Level III benefits in the amount of $859,612.[5]

Dr. Muttreja also attested in the Green Form that Mr. Kennedy did not suffer from congenital aortic valve abnormalities.  Under the Settlement Agreement, the presence of congenital aortic valve abnormalities, specifically, "unicuspid, bicuspid or quadricuspid aortic valve[s], [or] ventricular septal defect associated with aortic regurgitation," requires the payment of reduced Matrix Benefits.  Settlement Agreement § IV.B.2.d.(2)(c)i)a).  As the Trust does not contest the Estate's entitlement to Level III benefits, the only issue before us is whether the Estate is entitled to payment on Matrix A-1 or Matrix B-1.

The Trust forwarded the claim for review by Rohit J. Parmar, M.D., F.A.C.C., one of its auditing cardiologists.[6]  In

---

5.  Under the Settlement Agreement, a representative claimant is entitled to Level III benefits if the Diet Drug Recipient suffered from "left sided valvular heart disease requiring ... [s]urgery to repair or replace the aortic and/or mitral valve(s) following the use of Pondimin® and/or Redux™."  Settlement Agreement § IV.B.2.c.(3)(a).

6.  The Estate's claim was originally audited in March, 2012 by Robert Gillespie, M.D., one of the Trust's auditing cardiologists.  In audit, Dr. Gillespie determined that there was no reasonable medical basis for the attesting physician's finding that Mr. Kennedy did not have a congenital aortic valve

(continued...)

audit, Dr. Parmar concluded that there was no reasonable medical

basis for Dr. Muttreja's representation that Mr. Kennedy did not

have a congenital aortic valve abnormality.  Dr. Parmar

explained:

> The aortic valve is a bicuspid aortic valve
> with associated aortic valve stenosis and
> aortic regurgitation.  The bicuspid aortic
> valve is identified at pathology.  Please see
> the pathology report which states "Bicuspid
> aortic valve with aortic stenosis."[7]

Based on Dr. Parmar's finding that Mr. Kennedy had a

congenital aortic valve abnormality, the Trust issued a

post-audit determination that the Estate was entitled only to

Matrix B-1, Level III benefits.  Pursuant to the Rules for the

Audit of Matrix Compensation Claims ("Audit Rules"), the Estate

contested this adverse determination.[8]  In contest, the Estate

---

6.  (...continued)
abnormality.  The Estate's claim was subjected to re-audit
pursuant to Court Approved Procedure No. 11.

7.  Dr. Parmar also determined that there was no reasonable
medical basis for the attesting physician's finding that
Mr. Kennedy did not have aortic stenosis as defined by the
Settlement Agreement.  Under the Settlement Agreement, the
presence of aortic stenosis also requires the payment of reduced
Matrix Benefits.  See Settlement Agreement § IV.B.2.d.(2)(c)i)c).
Given our disposition with respect to Mr. Kennedy's congenital
aortic valve abnormality, we need not address this issue.

8.  Claims placed into audit on or before December 1, 2002 are
governed by the Policies and Procedures for Audit and Disposition
of Matrix Compensation Claims in Audit, as approved in Pretrial
Order ("PTO") No. 2457 (May 31, 2002).  Claims placed into audit
after December 1, 2002 are governed by the Audit Rules, as
approved in PTO No. 2807 (Mar. 26, 2003).  There is no dispute
that the Audit Rules contained in PTO No. 2807 apply to this
claim.

-4-

argued that Dr. Parmar inappropriately relied solely on the pathology report for Mr. Kennedy's aortic valve surgery and, in doing so, "disregarded the instructions that are found in Part II of the Green Form."  The Estate contended that the Green Form required a review of an echocardiogram, a cardiac catheterization, or surgical examination to determine the presence of a specific medical condition.[9]  Accordingly, the Estate asserted that it was entitled to Matrix A-1 benefits because the auditing cardiologist did not find echocardiographic evidence of a congenitally bicuspid valve and the surgeon stated that Mr. Kennedy's aortic valve was "trileaflet."[10]

Although not required to do so, the Trust forwarded the claim to the auditing cardiologist for a second review. Dr. Parmar submitted a declaration in which he again concluded that there was no reasonable medical basis for the attesting physician's finding that Mr. Kennedy did not have a congenital aortic valve abnormality.  Dr. Parmar stated, in pertinent part:

> 9.    In accordance with the Trust's request,
>       I reviewed the Claim and Claimant's
>       Contest Materials.  Both a bicuspid

9.   The Estate also asserted that "[m]ost likely, the [auditing cardiologist] withheld the echocardiographic evidence of a tricuspid aortic valve, because such evidence was favorable to the [Estate]."  The Estate does not provide any support for this assertion.

10.  The Estate also argued that a claim cannot be reduced to the B Matrix unless the condition was diagnosed between the commencement of Diet Drug use and the end of the Screening Period.  We have rejected this argument.  See, e.g., PTO No. 8822, at 9-12 (Feb. 22, 2012), aff'd, 525 F. App'x 140 (3d Cir. 2013).

-5-

aortic valve and Aortic Stenosis are
clearly seen on the March 28, 2007
[transesophageal echocardiogram]
submitted at Contest.  The
[transesophageal echocardiogram] at
10:49 confirms the presence of a
bicuspid aortic valve.  While bicuspid
aortic valve is not noted on the
[transesophageal echocardiogram] report,
it is clearly evident from review of the
study....

10.  At Contest, I also re-reviewed the
February 7, 2002 echocardiogram of
attestation, as well as Claimant's
March 5, 2007 [transthoracic
echocardiogram] and March 9, 2007
cardiac catheterization study....  The
March 5, 2007 [transthoracic
echocardiogram] is of reasonable quality
but not enough for me to determine
whether there is a bicuspid or a
tricuspid aortic valve, nor can I
determine the nature of the aortic valve
on the March 9, 2007 cardiac
catheterization study.

11.  Based on my review, I confirm my finding
at audit that there is no reasonable
medical basis for the Attesting
Physician's representations that
Claimant did not have congenital aortic
valve abnormalities or Aortic Stenosis.
Claimant had a bicuspid aortic valve,
which is evident on the March 28, 2007
[transesophageal echocardiogram] and
noted on the Pathology Report....

The Trust then issued a final post-audit determination,

again determining that the Estate was entitled only to

Matrix B-1, Level III benefits.  The Estate disputed this final

determination and requested that the claim proceed to the show

cause process established in the Settlement Agreement.  See

Settlement Agreement § VI.E.7.; PTO No. 2807, Audit Rule 18(c).

The Trust then applied to the court for issuance of an Order to

show cause why this claim should be paid.  On January 25, 2013,
we issued an Order to show cause and referred the matter to the
Special Master for further proceedings.  See PTO No. 8997
(Jan. 25, 2013).

Once the matter was referred to the Special Master, the
Trust submitted its statement of the case and supporting
documentation.  The Estate then served a response upon the
Special Master.  The Trust submitted a reply on March 28, 2013,
and the Estate submitted a sur-reply on April 18, 2013.  Under
the Audit Rules, it is within the Special Master's discretion to
appoint a Technical Advisor[11] to review claims after the Trust
and the representative claimant have had the opportunity to
develop the Show Cause Record.  See Audit Rule 30.  The Special
Master assigned a Technical Advisor, Gary J. Vigilante, M.D.,
F.A.C.C., to review the documents submitted by the Trust and the
Estate and to prepare a report for the court.[12]  The Show Cause

_____

11.  A "[Technical] [A]dvisor's role is to act as a sounding
board for the judge--helping the jurist to educate himself in the
jargon and theory disclosed by the testimony and to think through
the critical technical problems."  Reilly v. United States,
863 F.2d 149, 158 (1st Cir. 1988).  In a case such as this, where
conflicting expert opinions exist, it is within the discretion of
the court to appoint a Technical Advisor to aid it in resolving
technical issues.  Id.

12.  The Estate filed Objections to the Special Master's Order
Referring Claim to a Technical Advisor for Review and Motion to
Close Show Cause Record.  We previously have recognized that it
is within our discretion to appoint a technical advisor,
particularly where, as here, there are conflicting expert
opinions at issue.  See, e.g., Mem. in Supp. of PTO 9077
(May 29, 2013).  Thus, we will overrule the Estate's objections
(continued...)

Record and Technical Advisor Report are now before the court for final determination.  See id. Rule 35.

The issue presented for resolution of this claim is whether the Estate has met its burden of proving that there is a reasonable medical basis for the attesting physician's finding that Mr. Kennedy did not have a congenital aortic valve abnormality.  See id. Rule 24.  Ultimately, if we determine that there is no reasonable medical basis for the answer in the Green Form that is at issue, we must affirm the Trust's final determination and may grant such other relief as deemed appropriate.  See id. Rule 38(a).  If, on the other hand, we determine that there is a reasonable medical basis for the answer, we must enter an Order directing the Trust to pay the claim in accordance with the Settlement Agreement.  See id. Rule 38(b).

In support of its claim, the Estate reasserts the arguments made in contest.  The Estate also argues that the reasonable medical basis standard requires that deference be given to the conclusions of the attesting physician.  In addition, the Estate contends that, because the auditing cardiologist did not find evidence of a bicuspid aortic valve on Mr. Kennedy's February 7, 2002 echocardiogram, the bicuspid valve was not "congenital" as required by the Settlement Agreement.

---

12.  (...continued)
and deny its motion to close the Show Cause Record.

The Estate also submitted a declaration of Paul W. Dlabal, M.D.,

F.A.C.P., F.A.C.C., F.A.H.A., who stated, in pertinent part:

> 2.    I reviewed the 3/28/07 [transesophageal
> echocardiogram] disc and the 11/29/12
> Declaration of Rohit Parmar, M.D.
>
> 3.    In his declaration, Dr. Parmar alleged
> that a bicuspid aortic valve is "clearly"
> seen on the 3/28/07 [transesophageal
> echocardiogram].  He further alleged that the
> [transesophageal echocardiogram] confirms the
> presence of a bicuspid aortic valve at 10:49.
> These opinions are incorrect.
>
>> a)    There is no evidence of a bicuspid
>>       aortic valve on this study.
>>
>> b)    There is no image whatsoever
>>       identified at time stamp 10:49.
>
> 4.    A normal aortic valve (AoV), in
> cross-sectional views, has three cusps which
> meet in the middle, such that the lines of
> apposition form a "Mercedes Benz" sign,
> readily seen on echocardiogram.
>
> In this case, image loops 28, 29 (and to
> a lesser quality 39) are cross-sections of
> the [aortic valve].  These cross-sectional
> views clearly show the presence of three
> cusps.  The cusps are thickened and two may
> be partially fused, thus rendering the
> appearance of a "bicuspid" valve....
> However, on closure they produce the
> tri-partite "Mercedes Benz" sign, which
> confirms the presence of a congenitally
> normal tricuspid [aortic valve].[13]

Finally, the Estate asserts that the Settlement Agreement and the

Seventh Amendment to the Settlement Agreement "guaranteed class

members certain benefits related to valve surgery."

---

13.   Dr. Dlabal also attached three still frame images from the
echocardiogram, which purportedly demonstrate a tricuspid aortic
valve.

In response, the Trust argues that the Estate has not
established a reasonable medical basis for Dr. Muttreja's
representation that Mr. Kennedy did not have a congenital aortic
valve abnormality.  In addition, the Trust asserts that it
properly applied the reasonable medical basis standard.

The Technical Advisor, Dr. Vigilante, reviewed the
echocardiograms dated February 7, 2002; March 5, 2007; and
March 28, 2007 and concluded that there was no reasonable medical
basis for the attesting physician's finding that Mr. Kennedy did
not have a congenital aortic valve abnormality.  As to the
February 7, 2002 echocardiogram, Dr. Vigilante stated, in
pertinent part:

> As noted at time frame 00:25 of the study,
> the aortic leaflets did not close in the mid
> line which is suggestive of a bicuspid aortic
> valve.  At time 2:59 on this tape, the
> parasternal short-axis view demonstrated
> calcification and fusion of the right and
> left coronary leaflets with a raphe and poor
> motion.  Only the non-coronary leaflet moved
> adequately.  This study was diagnostic of a
> congenital bicuspid aortic valve.

As to the March 5, 2007 echocardiogram, Dr. Vigilante
observed that, "In the parasternal long-axis view, the [aortic]
valve did not close in the middle axis with a congenital bicuspid
aortic valve noted."  As to the March 28, 2007 echocardiogram,
Dr. Vigilante explained, in pertinent part:

> Evaluation of the aortic valve demonstrated
> this to be an obvious congenital bicuspid
> valve with congenital fusion of the left and
> right coronary leaflets.  There was a raphe
> noted between these two leaflets....  This
> congenital bicuspid valve was obvious in real

-10-

> time loops 10, 11, 12, 13, 28, 29, 30, and
> 43.... It should be noted that Dr. Dlabal is
> wrong when he stated that there was no
> evidence of a bicuspid aortic valve on this
> study. Indeed, the three screen shots
> submitted by Dr. Dlabal clearly show a
> bicuspid aortic valve with a raphe between
> the right and left coronary leaflets classic
> for a congenitally bicuspid aortic valve.

In response to the Technical Advisor Report,[14] the

Estate argues that the Technical Advisor substituted his own

opinion for that of Mr. Kennedy's cardiologists and that he did

not consider all of the relevant evidence, including evidence

supportive of the Estate's arguments.[15]

After reviewing the entire Show Cause Record, we find

the Estate's arguments are without merit. As noted, the

Settlement Agreement requires that a claim for Level III Matrix

---

14. The Estate initially included with its response to the
Technical Advisor Report verified "rebuttals" by Dr. Muttreja and
Dr. Dlabal. Pursuant to Audit Rule 34, the Special Master
determined these rebuttals could not become part of the Show
Cause Record. Thereafter, the Estate filed "objections" to the
decision denying the inclusion of these rebuttals in the Show
Cause Record and a motion to have them included. According to
the Estate, in their rebuttals, Dr. Muttreja and Dr. Dlabal
disputed the Technical Advisor's finding of congenital aortic
valve abnormality. Pursuant to Audit Rule 34, there is no
procedure by which Dr. Muttreja's and Dr. Dlabal's supplemental
declarations can become part of the Show Cause Record. See,
e.g., Mem. in Supp. of PTO No. 9041, at 9 n.11 (Apr. 5, 2013);
Mem. in Supp. of PTO No. 8402, at 12 n.13 (Feb. 22, 2010). For
these reasons, we overrule claimant's objections and deny its
motion.

15. In particular, the Estate asserts that Dr. Vigilante failed
to consider the observations of Mr. Kennedy's surgeon. Contrary
to the Estate's argument, the Technical Advisor Report reflects
that Dr. Vigilante did consider the separate report related to
Mr. Kennedy's aortic valve surgery.

Benefits based on damage to the aortic valve be reduced to the B Matrix if the Diet Drug Recipient had a congenital aortic valve abnormality, such as a bicuspid valve. See Settlement Agreement § IV.B.2.d.(2)(c)i)a). According to claimant, there is a reasonable medical basis for finding Mr. Kennedy did not have a congenital aortic valve because Dr. Dlabal found that Mr. Kennedy's March 28, 2007 echocardiogram did not show a bicuspid aortic valve.

Dr. Parmar, however, reviewed the March 28, 2007 echocardiogram and determined that it demonstrated a bicuspid aortic valve.[16] In addition, Dr. Vigilante reviewed the March 28, 2007 echocardiogram and concluded it "to be an obvious congenital bicuspid valve with congenital fusion of the left and right coronary leaflets." Dr. Vigilante also observed that "the three screen shots submitted by Dr. Dlabal clearly show a bicuspid aortic valve with a raphe between the right and left coronary leaflets classic for a congenitally bicuspid aortic valve."[17]

---

16. We also reject the Estate's assertion that the auditing physician never concluded that Mr. Kennedy had a "congenital" aortic valve abnormality. Dr. Parmar's declaration makes clear that he concluded there was no reasonable medical basis for the attesting physician's finding that Mr. Kennedy did not have a congenital aortic valve abnormality and he specifically noted that Mr. Kennedy's aortic valve was bicuspid, which constitutes a congenital aortic valve abnormality under the Settlement Agreement. See Settlement Agreement § IV.B.2.d.(2)(c)i)a).

17. For these reasons as well, we disagree with the Estate that the reasonable medical basis standard requires that deference be
(continued...)

Significantly, although the Estate argued that Mr. Kennedy's valve could not have been "congenital" unless it was present on the February 7, 2002 and March 5, 2007 echocardiograms, the Estate's physicians did not specifically address these echocardiograms.  As to these echocardiograms, the Estate relies only on the echocardiogram reports.  These reports, however, do not establish that Mr. Kennedy did not have a bicuspid aortic valve.  In fact, neither report states that Mr. Kennedy's aortic valve was normal or trileaflet.  In addition, Dr. Vigilante reviewed these two echocardiograms and concluded that both studies were diagnostic of a bicuspid aortic valve.[18]

In addition, the Estate's argument that the pathology report, which specifically notes in the "Final Diagnosis" that Mr. Kennedy had a "[c]ongenitally bicuspid aortic valve with fibrosis," should be disregarded because the presence of a congenital aortic valve abnormality only can be determined through echocardiographic evidence or surgical examination is misplaced.[19]  The Settlement Agreement identifies certain

---

17.   (...continued)
given to the conclusions of the attesting physician.

18.   Contrary to the Estate's argument, the Technical Advisor's findings are not "erroneous" simply because the auditing cardiologist did not determine whether the February 7, 2002 echocardiogram demonstrated the presence of a bicuspid aortic valve and could not determine the presence of a bicuspid aortic valve on the March 5, 2007 echocardiogram.

19.   While the Estate asserts that the pathologist only agreed that Mr. Kennedy's aortic valve was "functionally" bicuspid, this ignores the "Final Diagnosis," which specifically states that
(continued...)

reduction factors that are only applicable when there is

echocardiographic evidence of the condition.  See e.g.,

Settlement Agreement § IV.B.2.d.(2)(c)ii)e) (rheumatic mitral

valve); § I.39 (mitral valve prolapse).  As nothing in the

Settlement Agreement limits application of the reduction factor

of congenital aortic valve abnormalities to those that are

present based solely on a review of an echocardiogram, a cardiac

catheterization, or surgical examination, we decline the Estate's

request to impose this limitation.  In any event, Dr. Parmar and

Dr. Vigilante each found echocardiographic evidence of a bicuspid

aortic valve.[20]

Finally, we do not agree that the Estate is entitled to

Matrix A-1, Level III benefits under the Seventh Amendment.  As

an initial matter, the Seventh Amendment specifically states,

"The determinations and actions of the Trust on any aspect of a

claim for Cash/Medical Services Benefits of a Category One Class

Member or Category Two Class Member, or on any claim for the

Matrix Election Payment, shall have no preclusive or precedential

effect of any kind on the Trust in the administration ... of

---

19.  (...continued)
Mr. Kennedy's aortic valve was "congenitally" bicuspid, not
"functionally" bicuspid.

20.  For this reason, and because no other medical record in this
case reflects Mr. Kennedy had a tricuspid aortic valve, the
surgeon's isolated statement that Mr. Kennedy's aortic valve was
tricuspid does not satisfy the Estate's burden.

-14-

eZ

claims for Seventh Amendment Matrix Compensation Benefits."[21]

Seventh Amendment § IX.E.   The Seventh Amendment further provides

that:

> For each Category One Class Member or
> Category Two Class Member found to be
> eligible for Seventh Amendment Matrix
> Compensation Benefits, the Trust shall
> calculate as a Net Matrix Amount, a sum equal
> to the gross amount payable to the Diet Drug
> Recipient or Representative Claimant and
> their associated Derivative Claimants, if
> any, on the applicable Matrix under section
> IV.B.2 of the Settlement Agreement ....

Id. § IX.A.2. (emphasis added).   Section IV.B.2.d. sets forth

"[t]he circumstances which determine whether Matrix A-1 or Matrix

B-1 is applicable ...."   Settlement Agreement § IV.B.2.d.   As the

Estate has not established a reasonable medical basis for finding

that Mr. Kennedy did not have a congenital aortic valve

abnormality, the Settlement Agreement requires that the Estate's

Level III claim be reduced to the B Matrix.

Therefore, we will affirm the Trust's denial of the

Estate's claim for Matrix A-1 benefits and the related derivative

claim submitted by Mr. Kennedy's spouse, Patti Kennedy.

---

21.   Under the Seventh Amendment, Seventh Amendment Matrix
Compensation Benefits means "those Matrix Compensation Benefits
which may be paid or claimed for High Matrix Level Qualifying
Factors to or by Category One Class Members or Category Two Class
Members in accordance with the terms of the Seventh Amendment."
Seventh Amendment § I.64.   The Estate is a Category Two Class
Member, and its claim for Level III Matrix Benefits is a claim
for Seventh Amendment Matrix Compensation Benefits.